UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

C.A. NO.: 1:11-CV-11997-JGD

| | |
|---|---|
| MARIA BARBOSA, HENRIQUETA BARBOSA, )<br>MANUEL BARBOSA, and ANGELA BARBOSA, )<br>               Plaintiffs )<br>               )<br>v. )<br>               )<br>WILLIAM K. CONLON IN HIS CAPACITY AS CHIEF )<br>OF POLICE FOR CITY OF BROCKTON, MA, THOMAS )<br>HYLAND, BRYAN MAKER, JESSE DRANE, )<br>KENNETH LOFTSTRUM, BRYAN DONAHUE, )<br>STEVEN E. JOHNSON, MARK CELIA, )<br>MICHAEL DUBE, FRANK BAEZ, )<br>ANTHONY GIARDINI, EMANUEL GOMES, )<br>LEON MCCABE AND JOHN DOE 1-3, )<br>             Defendants )<br>               ) | **PLAINTIFFS' OPPOSITION TO TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

### I. STATEMENT OF THE CASE

Plaintiffs hereby adopt their Fed. R. Civ. P. 56(c)(2)(B)(ii) Additional Statement of Undisputed Material Facts filed with this Memorandum in Opposition and incorporated by reference.

### II. STANDARD OF REVIEW

The purpose of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991) *quoting* Garside v. Osco Drug, Inc., 895 F.2d 46, 50 (1st Cir. 1990).  The burden is on the moving party to show through pleadings, discovery, and affidavits, "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

A fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The Court must view the entire record in the light most favorable to the non-moving party and indulge all reasonable inferences in that party's favor, O'Connor v. Steeves, 944 F.2d 905, 907 (1st Cir. 1993), even if the motion is based upon qualified immunity. Morelli v. Webster, 552 F.3d 12, 23-24 (1st Cir. 2009).

### III. ARGUMENT

Defendants are not entitled to summary judgment on qualified immunity because there are genuine issues of material facts, and for the following reasons: 1) Plaintiffs have asserted with particularity their constitutional rights that have been violated. Anderson v. Creighton, 483 U.S. 635, 639 (1987); 2) Plaintiffs can demonstrate that the constitutional rights asserted were clearly established at the time of the defendants' actions, thus ensuring that the defendants had "fair warning" that the alleged action was, in fact, unconstitutional. Hope v. Pelzer, 536 U.S. 730, 740 (2002), taking into account the particular circumstances at issue in this particular case. Saucier v. Katz, 533 U.S. 194 (2001); and 3) they can demonstrate that qualified immunity is not available to the defendants in that while violating clearly established constitutional rights they were not acting under the mistaken but reasonable belief that their actions were lawful. *See* Malley v. Briggs, 475 U.S. 335, 341 (1986). The instant case is controlled, to the detriment of defendants' motion, by Morelli v. Webster, 552 F.3d 12, 23-24 (1st Cir. 2009).

**A. The Defendants Have No Qualified Immunity for Any of Their Actions Against the Plaintiffs.**

   1. <u>Defendants Have No Qualified Immunity for Their Warrantless Entry Into Plaintiffs' Home</u>.

      a. <u>Plaintiffs Have Particularly Asserted the Constitutional Right Violated</u>.

Plaintiffs have met the initial burden of asserting with particularity the right violated by Defendants. Please see <u>Facts</u> section of the <u>First Amended Complaint</u> and at Count VII therein, which alleges an illegal warrantless search, and describes it in great detail.

> b. <u>At the Time Of The Wrongful Actions The Right To Be Free From Warrantless Search Had Been Clearly Established</u>.

Defendants had fair warning that the Fourth Amendment to the U.S. Constitution established the right to be free from warrantless searches. Defendants admit that a basic principle of Fourth Amendment law is that searches and seizures inside a home without a warrant are presumptively unreasonable. <u>Groh v. Ramirez</u>, 540 U.S. 551, 559 (2004) *quoting* <u>Payton v. N.Y.</u>, 445 U.S. 573, 586 (1980); (some internal quotations omitted).  Indeed, "the protections of the Fourth Amendment are fundamental to the rights of all American citizens…" <u>Buenrostro v. Collazo</u>, 973 F.2d 39 (1st Cir. 1992).  The search warrant requirement was so clearly established in November 2008 that defendants had "fair warning" that such a warrant was necessary.

Loud music is not a basis for warrantless entry of a home:

> …."as the Supreme Court put it, 'it is difficult to conceive of a warrantless home arrest that would not be unreasonable under the Fourth Amendment when the underlying offense is extremely minor.' Playing music—even so loudly that it disturbs the neighbors—is an extremely minor offense." <u>Com.v. Kiser</u>, 48 Mass. App. Ct. 647, 651 (2000) *quoting* <u>Welsh v. Wisconsin</u>, 466 U.S. 740, 753 (1984).

Under Massachusetts law, Defendant Hyland had fair warning as to the warrant requirement for home entry where the only law enforcement problem was allegedly loud music.

> c. <u>Officer Hyland Did Not Act Under The Mistaken But Reasonable Belief That His Actions Were Lawful</u>.

The first police officer who entered the plaintiffs' residence in response to an alleged loud music complaint was Thomas Hyland (Plaintiffs' Fed. R. Civ. P. 56(c)(2)(B)(ii) Additional Statement of Undisputed Material Facts (hereinafter "Plaintiffs' Facts") at 1). Pursuant to the

Malley case, *supra*, if Hyland believed reasonably, but mistakenly, that his warrantless entry was lawful, he could be entitled to the defense of qualified immunity. On the contrary, however, Hyland lacked any such reasonable belief. In November 2008, Hyland had been a police officer for eight years (Plaintiffs' Facts at 2). He admitted that he knew the only two ways he could legally enter the plaintiffs' residence was with a warrant or consent of the homeowner:

> Q: Sure. So certainly we all know you can get consent to enter a home.
>
> A: Sure.
>
> Q: Or you can get a warrant; right?
>
> A: Yup.
>
> Q: And you already talked about you've never found it necessary to obtain a warrant in the past.[1]
>
> A: Right.
>
> Q: Okay. Did you receive consent to enter 22 Leavitt Street [plaintiffs' home]?
>
> A: No, I did not.

(Plaintiffs' Facts at 4). Hyland testified that his "legal basis" for crossing the threshold to plaintiffs' home without a warrant was "to quell the disturbance" (Plaintiffs' Facts at 5). Hyland also testified that as he approached the plaintiffs' home, he did not observe any criminal activity, was not chasing a felon, and had no reasonable articulable suspicion of a felony in progress (Plaintiffs' Facts at 6). "Quelling a disturbance" on the circumstances of this case, a family gathering with music being played, is not one of the three lawful ways (warrant, consent, or exigent circumstances) Hyland could have reasonably relied upon to justify entry into plaintiffs' home. (See below, Deposition of former Brockton Police Chief Conlon as to the three legal

---

[1] Hyland was asked earlier in his deposition:
> Q: Have you ever sought a warrant to enter a home where there was loud music?
> A: Never. (Plaintiffs' Facts at 3).

ways for police officers to gain entry into a private residence.) Therefore, Hyland knew or reasonably should have known that his action of warrantless entry was illegal, but he proceeded to do it nevertheless. Plaintiffs have a developed prima facie case that defendants had actual and/or constructive knowledge of the impropriety of their actions.  Stratton v. City of Boston, 731 F. Supp. 42, 49 (1989) *quoting* Krohn v. U.S., 742 F.2d 24, 31 (1st Cir. 1984); Morelli v. Webster, 552 F.3d 12, 23-24 (1st Cir. 2009). Hyland's knowingly illegal action is not entitled to the protection of the qualified immunity defense, nor is the ensuing entry by the remaining officers who arrived at the scene.

> d. Hyland's Justification For His Warrantless Entry to the Plaintiffs' Home Is Not a Recognized Exception to the Warrant Requirement And Is Unreasonable.

Hyland does not say he relied upon the "exigent circumstances" doctrine, and does not argue it here. He has admitted that he entered solely to "quell a disturbance" (and whether there was even anything going on that could be styled as a disturbance is a material factual dispute in this case, see below). Defendants recite the recognized "exigent circumstances" exceptions to the warrant requirement: to fight a fire and investigate its cause (Michigan v. Tyler, 436 U.S. 499, 509 (1978)); to prevent the imminent destruction of evidence (Ker v. California, 374 U.S. 23, 40 (1963)); "hot pursuit" of a fleeing suspect (U.S. v. Santana, 427 U.S. 38, 42 (1976)); or to assist persons who are seriously injured or threatened with such injury (Brigham City, Utah v. Stuart, 547 U.S. 398 (2006)). Quelling the music at a family gathering is not a legally recognized exception to the warrant requirement. Also, under the doctrine of Com. v. Kiser, *supra*, Hyland was on notice that "[P]laying music—even so loudly that it disturbs the neighbors—is an extremely minor offense."  Id. at 651 *quoting* Welsh v. Wisconsin, 466 U.S. 740, 753 (1984).

Hyland admits that all he initially confronted was alleged disturbance of the peace by playing music, which Hyland admitted was a misdemeanor (Plaintiffs' Facts at 7). Hyland testified that:

> I did enter that house to stop the music because the time that it would take to obtain a search warrant to merely get into a house to quell a disturbance would be unreasonable based on the fact that it would take so much time that the disturbance would go on and that would make it so that the police are impotent to perform their duties, so I felt justified going into the house and merely having the music stopped or at least lowered. (Plaintiffs' Facts at 8.)

The time it would take to obtain a search warrant is not a recognized exception to the warrant requirement, particularly in what was at most a non-emergency, low-level misdemeanor situation. The Supreme Judicial Court in Kiser held that warrantless arrests solely for loud music are illegal. The Kiser court wrote "if any statute permits a warrantless entry, its application must meet constitutional safeguards." Id. at 652. The First Circuit is very much in accord. *See* Morelli, *supra*.

Moreover, Brockton Police Chief (Ret.) William Conlon ("Conlon") testified at deposition that aside from obtaining a warrant, consent of the homeowner, and exigent circumstances, *there is no reason for a police officer to enter a private dwelling solely for loud music* (Plaintiffs' Facts at 9). That testimony binds the defendants. The Brockton Police also had an internal policy about noise complaints as evidenced in this exchange with Conlon:

> Q:   Let me ask it this way. I gave you a very general question, let me narrow it down a bit. Would it be fair to say that it was policy in November 2008 for Brockton police officers to see what they could do to get the people with the music to turn the music down?
>
> A:   Sure, that would be the routine.
>
> Q:   That would be the main goal?

6

A:    Yes.

Q:    And once the music is down, go do something else; right?

A:    Hopefully the music remains down.

Q:    And if the music remains down, it's leave, go do something else?

A:    Absolutely.

(Plaintiffs' Facts at 10 and 11.)

Defendants go on to imply that there is a "reasonableness" exception to the Fourth Amendment requirement of a search warrant. They state: "An officer's subjective intent is irrelevant; what is germane is the objective effect of his actions.  An action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed objectively, justify [the] action.' Scott v. U.S., 436 U.S. 128, 138 (1978)." However, Scott was a case in which persons convicted of drug trafficking and conspiracy based largely on conversations overheard on a wiretapped phone appealed on the grounds that the government agents had not complied with the so-called "minimization order" (to minimize the invasion of an individual's privacy) of 18 U.S.C. §2518(5). Id. at 135.  The quote from Scott relied upon by defendants refers to the statement of the Scott court that:

> Subjective intent alone, the Government contends, does not make otherwise lawful conduct illegal or unconstitutional.  We think the Government's position, which also served as the basis for our decision in the Court of Appeals, embodies the proper approach for evaluating compliance with the minimization requirement. Id. at 136-37.

Scott therefore has limited applicability to the present situation and does not support defendants' suggestion of a "reasonableness" exception to the warrant requirement.

Here, the plaintiffs and a witness have testified that—contrary to Hyland's testimony—they never heard Hyland's alleged "police" announcement before he entered.  Plaintiff

7

Henriqueta Barbosa ("Henriqueta") testified at deposition that on the date of the incident she was washing dishes at her sink when she happened to turn and notice two policemen standing inside of her kitchen (Plaintiffs' Facts at 12). Plaintiff Angela Barbosa ("Angela") testified at her deposition that two policemen entered the home without knocking and said they were there for loud music (Plaintiffs' Facts at 13). Angela also testified that she never heard the alleged two announcements of "police" and she never heard anyone inside the house state that the music would just be turned up once the police left (Plaintiffs' Facts at 14 and 15). Plaintiff Manuel Barbosa ("Manuel") testified at his deposition that he emerged from his bedroom where he was falling asleep to see what the commotion was and found the police handcuffing his wife, Henriqueta (Plaintiffs' Facts at 16). Non-party witness Antonio Daveiga ("Daveiga") testified at his deposition that when he saw the police squad car lights outside the home, he immediately went upstairs to turn down the music (Plaintiffs' Facts at 17). Before Daveiga even had time to leave the room, a police officer (presumably Hyland) entered the room upstairs and told Daveiga to turn the music all the way off, which he did (Plaintiffs' Facts at 18 and 19).

Hyland's version of these material facts is vigorously disputed so that summary judgment is inappropriate.

> 2. <u>Defendants Have No Qualified Immunity For Their Use of Excessive Force Against Plaintiffs</u>.

>> a. <u>Plaintiffs Have Particularly Asserted the Constitutional Right Violated</u>.

Plaintiffs have met the initial burden of asserting with particularity the right violated by the defendants in their Complaint, which alleges violations of 42 U.S.C. §1983 based on excessive force. Excessive force claims arise from the Fourth Amendment to the U.S. Constitution. *See* <u>Godette v. Stanley</u>, 490 F. Supp. 2d. 72, 78 (D. Mass. 2007).

      b.   <u>The Constitutional Right Violated was Clearly Established to Give Fair Warning</u>.

Section 1983 of the United States Code was enacted in 1871. *See* <u>Monroe v. Pape</u>, 365 U.S. 167 (1961) and <u>United Mine Workers v. Gibbs</u>, 383 U.S. 715, 725 (1966). As such, §1983 is long-standing, clearly established law. The protections of the Fourth Amendment are likewise long-standing and clearly established.

      c.   <u>The Defendants-State Actors Did Not Act Under The Mistaken But Reasonable Belief That Their Actions Were Lawful</u>.

Defendants' reliance on the "margin of error" for excessive force claims, especially at the summary judgment stage, is misplaced. *See* <u>Morelli</u>, *supra,* at 24. It is true that "for a plaintiff to defeat a qualified immunity defense, he must show 'an incommensurate use of force beyond that needed to establish a garden-variety excessive force claim, and, further, beyond the 'hazy border' noted by the <u>Saucier</u> court.'" <u>Id.</u>

However, in <u>Morelli</u> the Court held that the excessive force claim <u>survived</u> summary judgment on qualified immunity:

> We conclude, without serious question, that a rational jury could find that the force used by Webster to detain an unresisting woman who, at worst, was suspected of being a petty thief, was so disproportionate as to offend the Fourth Amendment. *See Alexis v. McDonald's Rests. of Mass., Inc.,* 67 F.3d 341, 353 (1st Cir.1995) (collecting cases in which force used to arrest was unreasonable in light of minor nature of crime)…The second branch of the test is also satisfied. A clearly established right is one sufficiently defined at a level of specificity that would put a state actor (such as a police officer) on fair notice that his specific actions offended the Constitution. *See Limone,* 372 F.3d at 46. Our case law supplies a crystal clear articulation of the right, grounded in the Fourth Amendment, to be free from the use of excessive force by an arresting officer. *See, e.g., Alexis,* 67 F.3d at 353–54 (concluding excessive force claim triable when officer seized and dragged plaintiff to effectuate arrest for crime of trespassing in a public restaurant). Given this well-settled jurisprudence, there is no legitimate doubt that the right asserted here was clearly established. Thus, Webster was on notice that a police officer's use of excessive force would be offensive to the Constitution.

Id. at 23-24.

     Morelli also teaches the importance of honoring the summary judgment standard, even in qualified immunity-based motions, such that courts are constrained to take the evidence in the light most favorable to the non-moving party. The facts relied upon by defendants to support the notion that reasonable force was used at Plaintiffs' home are that Henriqueta and Angela had already allegedly assaulted Hyland at the time they were arrested. The facts set forth in Defendants' Statement of Material Facts, strain credulity, and are hotly contested by plaintiffs. For instance, Hyland testified that he was assaulted by Henriqueta (Plaintiffs' Facts at 20). Hyland stated that he is approximately 6'1" tall and Henriqueta is 5'1" tall (Plaintiffs' Facts at 21). Hyland alleges that Henriqueta threw silverware from a strainer–but not the strainer itself-- up at the back of his head with such force that Hyland felt faint (Plaintiffs' Facts at 22). How such force could be achieved by a petite woman throwing at an upward angle prior to the silverware simply falling to the floor seemingly defies the laws of physics.

     Indeed, Hyland testified at deposition that even prior to Henriqueta's alleged silverware assault upon him, he asked her for identification so he could charge her with "anticipatory breach of the peace" (Plaintiffs' Facts at 23). Hyland did not know what Massachusetts criminal statute authorized a charge of anticipatory breach of peace (Plaintiffs' Facts at 24). (There is no such specimen in Massachusetts law, as the defendants well know.) Hyland verified that the music was off at this point (Plaintiffs' Facts at 25). Thus even by Hyland's testimony, the alleged breach of the peace was already over when he returned downstairs to identify the homeowners. According to Plaintiff Angela, no one ever stated that the music would be turned up after Hyland left (Plaintiffs' Facts at 15). Of course, the alleged breach of the peace at the plaintiffs' house was much more benign and *over* when Hyland decided to charge Henriqueta with "anticipatory"

breach of the peace. It is hard to imagine a police officer being more out of touch with the limitations of his authority.

The sad behavior of the Brockton police in trying to cover up the unconstitutionality of their behavior by inventing crimes was depressingly illustrated when defendant Conlon, the police chief in November 2008, testified at his deposition on "anticipatory breach of the peace":

> Q: And do you say that there is a statute in the Commonwealth that prohibits anticipatory breach of the peace or anticipatory disturbance of the peace?
>
> A: I don't know that it's a statute, but it's been recognized repeatedly, you know, historically in Brockton District Court at least.
>
> Q: In the Brockton District Court?
>
> A: I believe so.
>
> Q: What are the elements of the crime of anticipatory breach of the peace?
>
> A: It would be the same as disturbance of the peace only it's quite evident that this is about to take place.
>
> Q: That something is about to take place. If the thing is about to take place but doesn't, can you get a conviction on that?
>
> A: I don't know.

(Plaintiffs' Facts at 26 and 27). The Model Jury Instruction for Disturbance of the Peace was presented to Conlon. He was then asked:

> Q: What would the instruction for anticipatory breach of the peace add to this, if you know?
>
> A: Well, I don't know, so.
>
> Q: Have you ever obtained a conviction against anybody for anticipatory breach of

        the peace or anticipatory disturbance of the peace?

A:    No, not myself.

Q:    Do you know anyone that has?

A:    No, not offhand.

(Plaintiffs' Facts at 28).

    The facts that plaintiffs and Daveiga assert are as follows: Henriqueta testified that she did not hit Hyland with anything nor did she see Angela throw a cell phone at him (Plaintiffs' Facts at 29 and 30). According to Henriqueta, Hyland slipped in the kitchen and fell while attempting to arrest a guest, John Andrade, hitting his head on the strainer of silverware and taking Henriqueta down with him (Plaintiffs' Facts at 31). Angela confirmed Henriqueta's testimony at her own deposition (Plaintiffs' Facts at 32, 33, and 34). The non-party witness Daveiga likewise testified that he did not see Henriqueta or Angela hit anyone (Plaintiffs' Facts at 35).

    Against these facts, the amount of force used to arrest Henriqueta and Angela was excessive and unreasonable. The fact pattern is quite analogous to that of <u>Morelli</u>, *supra*, with a minimalistic or non-crime and petite female victims physically brutalized by a large police officer, but here with the extra component of an unwarranted home invasion to get things underway. Henriqueta testified that after she was handcuffed, the police picked her up, hurled her against a wall and then outside onto her porch, and dragged her to the police cruiser (Plaintiffs' Facts at 36). Angela, at the time of incident underlying this lawsuit, was one week post-partum after delivering via cesarean (Plaintiffs' Facts at 37). She was handcuffed, dragged by her arm and hair by the police out of the house, down the porch steps, and to the police cruiser as she started bleeding from her cesarean incision (Plaintiffs' Facts at 38).

Plaintiff Maria Barbosa ("Maria") went to the police station after learning that her mother and sister were under arrest (Plaintiffs' Facts at 39). Her sister Nilda Barbosa went to the front desk window in the station lobby to ask about their mother and sister, but was repeatedly ignored by the officers on duty (Plaintiffs' Facts at 40). Maria then approached the window and requested medical assistance for her mother and sister (Plaintiffs' Facts at 41). (More on the defendants' medical indifference below.) She, too, was ignored (Plaintiffs' Facts at 42). Eventually, an officer later identified as Steve Johnson told Maria to return in 30 minutes and her family members would be ready to be bailed out (Plaintiffs' Facts at 43). Maria started to leave the police station, but then decided 30 minutes was not too long to just wait in the lobby area (Plaintiffs' Facts at 44). As she turned to sit down again, Officer Johnson began yelling at her and pushing her out the exit (Plaintiffs' Facts at 45). It should be noted that Maria is approximately five feet tall and weighs 100 lbs. (Plaintiffs' Facts at 46). Officer Johnson attempted to strike Maria, but she ducked him twice and blocked one attempted punch (Plaintiffs' Facts at 47). Officer Johnson then grabbed Maria, twisted her around, dragged her back into the lobby area (Plaintiffs' Facts at 48). He slammed Maria's head on a lobby chair and handcuffed her while other officers piled on top of her (Plaintiffs' Facts at 49). After she was handcuffed, Officer Johnson punched Maria in the face (Plaintiffs' Facts at 50). She was then dragged into the station garage and handcuffed to a bar alongside her mother and sister (Plaintiffs' Facts at 51). Notably, the tape from the surveillance camera in the lobby of the police station is missing (Plaintiffs' Facts at 52).

Taking all the evidence in the light most favorable to plaintiffs, the actions of defendants are entitled to no "margin of error" or "reasonable use of unreasonable force" analysis, <u>Morelli</u>,

13

*supra*, and were unreasonable under the circumstances. In light of the material issues of disputed facts presented, defendants are not entitled to qualified immunity.

> 3. Defendants Have No Qualified Immunity for Their Medical Indifference to Plaintiffs.

>> a. Plaintiffs have Particularly Asserted the Constitutional Right Violated.

In their Complaint and Amended Complaint, Plaintiffs have described the injuries caused by the defendants and the defendants' indifference to their need for medical attention. Failure of the police to provide adequate medical care for injuries sustained during apprehension violates the Fourteenth Amendment. See Brace v. Mass., 673 F. Supp. 2d 36, 40 (D. Mass. 2009).

>> b. The Constitutional Right Violated was Clearly Established to Give Fair Warning.

Massachusetts case law holds that "the constitutional standard is clear. Since at least 1983 there has been no doubt that a pre-trial detainee is entitled to medical attention for serious medical needs under the due process clause of the Constitution. See City of Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244 (1983)." Consolo v. George, 58 F.3d 791, 794-95 (1st Cir. 1995). There was fair warning to the defendants here of the violation of the plaintiffs' clearly established right to medical treatment.

>> c. The Defendants-State Actors Did Not Act Under the Mistaken but Reasonable Belief that their Actions were Lawful.

Defendants in their summary judgment motion conclude that "the plaintiff must prove that officers had a 'culpable state of mind and intended wantonly to inflict pain.' LaFrenier v. Kinirey, 478 F. Supp. 2d 126, 140 (D. Mass. 2007) *quoting* DesRosiers v. Moran, 949 F.2d 15, 19 (1st Cir. 1991). Here, Plaintiffs' claims suffer from a fatal defect, as the actions described do not evince deliberate indifference. Plaintiffs never asked for medical treatment and were not observed to require medical treatment, and therefore cannot prove they were denied same."

Defendants' version of the facts is again vigorously disputed by the plaintiffs. Almost from the moment of their unlawful arrests at their home, Henriqueta and Angela were in obvious pain and asking for medical treatment. Henriqueta testified at deposition that her right arm was swollen and bruised from being thrown against the wall or basement door in her house by the police (Plaintiffs' Facts at 53). At the police station while she was handcuffed to a bar in the station garage, Henriqueta testified that she was "screaming with pain" and asking, "Please. I have so much pain. Take these cuffs off me because I can't take the pain. My arm is broken." (Plaintiffs' Facts at 54). At the time of her deposition, Henriqueta needed surgery on her right shoulder to repair the damage done by the defendants' brutality (Plaintiffs' Facts at 55).

Angela testified at her deposition that due to the rough treatment she received by the police at the house, she immediately started bleeding from her cesarean incision (Plaintiffs' Facts at 56). In the cruiser on the way to the police station, she told the officer transporting her that she was bleeding, was recovering from a C-section, and needed medical assistance (Plaintiffs' Facts at 57).

When Maria arrived at the police station, she testified that she also asked for medical treatment for her mother and sister based on what she learned had transpired at the family home (Plaintiffs' Facts at 41). After her own assault by Officer Johnson, Maria testified to her visible injuries: "my face was just swollen. I had bruises, cuts on my face. It had blood coming out and it just looked—they [her mother and sister] thought I had a broken cheek, or something, because that's how swollen my face was from what they did…" (Plaintiffs' Facts at 58). Until they were released from the police station that night no medical treatment was provided to the plaintiffs, despite their objective and visible need for medical attention (Plaintiffs' Facts at 59).

The officers' "culpable state of mind and inten[t to] wantonly to inflict pain" defined by LaFrenier, *supra*, is evidenced by the xenophobic and racist comments of the defendants. While Angela was being shoved into the police cruiser, the arresting officer called her an "immigrant" and said "go back to your country" (Plaintiffs' Facts at 60). While Henriqueta was in the police station garage handcuffed to the bar awaiting booking, officers taunted her by calling her an immigrant, telling her to go back to her country, and to "call Obama" (Plaintiffs' Facts at 61). Just before her assault when Maria attempted to sit and wait in the lobby for the release of her mother and sister, Officer Johnson yelled, "immigrant bitch" as came from behind the window into the lobby (Plaintiffs' Facts at 62). As Officer Johnson pushed Maria towards the exit, he again called her an "immigrant bitch" and told her to go back to her own country (Plaintiffs' Facts at 63). After Maria joined her mother and sister handcuffed to the bar in the station garage, an African-American officer called the three women "animals", told them to go back to their country, and said "I don't like Cape Verdean people" (Plaintiffs' Facts at 64). A white officer with grey hair also said to the women, "I hate Cape Verdean people" (Plaintiffs' Facts at 65). All of the Plaintiffs are naturalized U.S. citizens (Plaintiffs' Facts at 66).

These statements show that the police had a bias against immigrants generally and some to Cape Verdean people in particular. By beating the plaintiffs and viewing them as "animals" the defendants demonstrated their animus towards Henriqueta, Angela, and Maria that caused the defendants to first assault the female plaintiffs and then to deny them medical treatment while in police custody. Therefore, the defendants are not entitled to qualified immunity for their medical indifference. As the facts surrounding the infliction of plaintiffs' injuries and refusal of their requests for treatment are in dispute, summary judgment is not appropriate.

    4. <u>Plaintiffs Have Alleged Threats, Intimidation, or Coercion Under the Massachusetts Civil Rights Act</u>.

The prima facie case under the Massachusetts Civil Rights Act ("MCRA") is: (1) a plaintiff's exercise or enjoyment of rights secured by the constitution or laws of either the United States or the Commonwealth; (2) has been interfered with, or attempted to be interfered with; and (3) that the interference or attempted interference was by threats, intimidation or coercion. Swanset Dev. Corp. v. Taunton, 423 Mass. 390, 395 (1966).

Counts II, IV, and VI of plaintiffs' Complaint contain their allegations of violations of the MCRA. As more fully set out in Sections 1-3, above, Plaintiffs were denied of their constitutional rights under the Fourth and Fourteenth Amendments by the actions of the defendants. The actions of the defendants in unlawfully entering the plaintiffs' home, brutalizing Henriqueta and Angela during an unlawful arrest, assaulting Maria at the police station, and being medically indifferent to their injuries meet and exceed the requirements for proving a violation of the MCRA. As the defendants dispute the facts supporting the plaintiffs' allegation of MRCA violations, summary judgment should be denied.

> 5. Plaintiffs Have Alleged a Custom, Policy, or Practice of Excessive Force and/or False Arrest Evidencing a 'Deliberate Indifference' to the Rights of its Inhabitants.

Defendants next assert that because suit was filed against Chief Conlon in his official capacity, plaintiffs have merely sued the City of Brockton in another form and therefore Conlon should be dismissed as redundant. *See* Defendants' Memorandum in Support of Their Motion for Summary Judgment at pages 9-10. The Defendants next seem to state that the suit against the City of Brockton must fail because "Plaintiff has failed to allege a custom, policy, or practice of excessive force and/or false arrest evidencing a 'deliberate indifference' to the rights of its inhabitants. Monell v. New York City Dep't. of Soc. Svces., 436 U.S. 658 (1978)." Id. at 10.

Plaintiffs have alleged a "custom, policy, or practice" of the defendants of excessive force and/or false arrest as more fully described in Section 3(c), above. The anti-immigrant, anti-Cape Verde bias of the Brockton Police Department is clearly alleged in Plaintiffs' Complaint, Amended Complaint, and deposition testimony. As soon as the situation at the plaintiffs' home escalated to their being falsely arrested, the first epithets used against the plaintiffs were anti-immigrant. Similarly, in transport to the police station, the police commented on the fact that the plaintiffs were immigrants in a derogatory way. In the police station garage and to Maria, the barrage of anti-immigrant and anti-Cape Verdean sentiments continued. It is this racism and xenophobia that supports the defendants' practice of excessive force and false arrest of the plaintiffs. The beatings, false arrest, verbal abuse, and refusal of medical treatment show the "deliberate indifference" of the defendants to the inhabitants of the City of Brockton.

      6.   <u>Plaintiffs Have Proved Defendants Committed State Law Torts</u>.

          a.   <u>Defendants committed intentional infliction of emotional distress</u>.

Defendants state that because there was (allegedly) probable cause to arrest the female plaintiffs, they cannot maintain a cause of action for intentional infliction of emotional distress. First, the plaintiffs vigorously deny that there was probable cause to arrest them based on the facts in Section 2 on excessive force, above. While false arrest, without more, cannot give rise to a successful claim of intentional infliction of emotional distress, *see* <u>Sena v. Com.</u>, 629 N.E.2d 986, 994 (Mass. 1994), the female plaintiffs endured much more than just being calmly placed in handcuffs and a ride to the police station. As above, the police entered plaintiffs' home without a warrant on a noise complaint, then brutally assaulted Henriqueta and Angela by roughly handcuffing them, throwing them around, and dragging them into police cruisers while shouting epithets at the women. The police later slammed Maria's head into a chair at the police station,

handcuffed her, and punched her face. The female plaintiffs' objective and visible injuries along with their requests for medical attention were ignored. In Eason v. Alexis, 824 F. Supp. 2d 236 (D. Mass. 2011), this Court found that a plaintiff's intentional infliction of emotional distress allegation arising from an assault and injuries inflicted by a police officer, the pointing of a loaded gun at plaintiff, and the filing of a false criminal complaint against the plaintiff as a cover up were sufficient to avoid a summary judgment on his emotional distress claim. *See also* Poy v. Boutselis, 352 F.3d 479, 485-86 (1st Cir. 2003) where an assault and an arrest without probable cause by the police were sufficient to support a claim of intentional infliction of emotional distress.

Next defendants state incorrectly based on Agis v. Howard Johnson, 371 Mass. 140 (1976) that because Manuel Barbosa "has suffered no physical injury, he cannot recover" for intentional infliction of emotional distress. The Agis case held that physical injury was *not* a requirement to successfully claim intentional infliction of emotional distress. Id. at 144. Manuel suffered emotional harm by witnessing the abuse and arrest of his wife and daughter in his home while his grandchildren were present (Plaintiffs' Facts at 67).

   b. Defendants Committed False Arrest.

Defendants allege in their summary judgment motion that because they "had probable cause to arrest the Plaintiffs,…the tort for false arrest must be dismissed." The definition of probable cause is: "'the facts and circumstances within [the police's] knowledge and of which [they] had reasonably trustworthy information [and that] were sufficient to warrant a prudent [officer] in believing the [alleged perpetrator] had committed or was committing an offense.'" White v. Town of Marblehead, 989 F. Supp. 345, 349 (D. Mass. 1997) *quoting* Rivera v. Murphy, 979 F.2d 259, 263 (1st Cir. 1992).

Summary judgment is not appropriate on this count because by plaintiffs' facts and allegations, the defendants' did not meet the probable cause standard prior to arresting them. *See also* Section 1, above.

      c.    <u>Defendants Committed Assault and Battery</u>.

Defendants claim that because the arrest of the plaintiffs was based on probable cause and an appropriate amount of force, "this count must be dismissed." Again, however, plaintiffs dispute defendants' version of the facts so that summary judgment is inappropriate here. As more fully detailed in Sections 2(c) and 3(c), above, defendants assaulted and battered the plaintiffs during their arrest and detainment at the police station.

## IV. CONCLUSION

For all of the reasons expressed above, Plaintiffs request this Honorable Court to DENY Defendants' Motion for Summary Judgment as essentially every material fact is in dispute and they are not entitled to judgment as a matter of law.

Dated: March 19, 2013

Plaintiffs,
By their attorney,
*/s/* Charles P. Kazarian
_____
Charles P. Kazarian, Esq., BBO# 262660
LAW OFFICE OF CHARLES P. KAZARIAN
160 State St., 6th Floor
Boston, MA  02109
(617) 723-9900
cpk@kazarianlaw.com

**CERTIFICATE OF SERVICE**

I, Charles P. Kazarian, hereby certify that on this 19th day of March 2013, I served the foregoing electronically to Stephen C. Pfaff, Esq., Louison, Costello, Condon & Pfaff, LLP, 101 Summer Street, Boston, MA  02110

                        */s/* Charles P. Kazarian
                        _____
                        Charles P. Kazarian, Esq.