UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| MARIA BARBOSA, HENRIQUETA | ) | |
| BARBOSA, MANUEL BARBOSA, | ) | |
| and ANGELA BARBOSA, | ) | |
| | ) | CIVIL ACTION |
| Plaintiffs, | ) | NO. 11-11997-JGD |
| v. | ) | |
| THOMAS HYLAND, JESSE DRANE, | ) | |
| BRIAN DONAHUE, STEVEN JOHNSON, | ) | |
| FRANK BAEZ, EMANUEL GOMES, | ) | |
| and LEON McCABE, | ) | |
| | ) | |
| Defendants. | ) | |

## FINDINGS OF FACT AND RULINGS OF LAW

December 2, 2013

DEIN, U.S.M.J.

## I.  INTRODUCTION

This action arises out of an altercation between the plaintiffs and various Brockton police officers on November 15, 2008 at the plaintiffs' home.  A jury-waived trial was held before this court on July 15, 16, 17 and 18, 2013.  The parties have submitted proposed findings of fact and rulings of law.  The court has been provided with draft transcripts of the trial.  After careful consideration of the transcripts, exhibits, and the parties' submissions, this court makes the following findings of fact and rulings of law.

As detailed more fully below, judgment shall enter:

1.      in favor of Henriqueta Barbosa against the defendants Thomas Hyland and Brian Donahue, jointly and severally, for their unlawful entry into her home, in violation

of her Fourth Amendment rights, in the amount of $25,000, plus interest, costs and fees pursuant to 42 U.S.C. § 1983.

2.      in favor of Manuel Barbosa against the defendants Thomas Hyland and Brian Donahue, jointly and severally, for their unlawful entry into his home, in violation of his Fourth Amendment rights, in the amount of $7,500, plus interest, costs and fees pursuant to 42 U.S.C. § 1983.

3.      in favor of Henriqueta Barbosa against the defendant Thomas Hyland for his use of excessive force in connection with her arrest, in violation of her Fourth Amendment rights, in the amount of $5,000, plus interest, costs and fees pursuant to 42 U.S.C. § 1983.  This award shall also compensate Henriqueta for her claims of assault and battery.

4.      in favor of Angela Barbosa against the defendant Jesse Drane for his use of excessive force in connection with her arrest, in violation of her Fourth Amendment rights, in the amount of $7,500, plus interest, costs and fees pursuant to 42 U.S.C. § 1983. This award shall also compensate Angela for her claims of assault and battery.

5.      in favor of Maria Barbosa against the defendants Steven E. Johnson and Frank Baez, jointly and severally, for their use of excessive force, in violation of her Fourth Amendment rights, in the amount of $15,000 plus interest, costs and fees pursuant to 42 U.S.C. § 1983.  This award shall also compensate Maria for her claims of false arrest and assault and battery.

6.      in favor of defendants Emanuel Gomes and Leon McCabe on all claims against them.

7.      Count XVIII (Intentional Infliction of Emotional Distress) is dismissed, as are the plaintiffs' claims based on alleged deliberate indifference to the plaintiffs' medical needs.

## II.  FINDINGS OF FACT

### The Plaintiffs

The plaintiffs Manuel and Henriqueta Barbosa, husband and wife, are the owners of a single family home located at 22 Leavitt Street, Brockton, Massachusetts.  They purchased the house on May 28, 1988.  At the time of trial, Manuel was 61 years old and Henriqueta was 54.

Manuel and Henriqueta are American citizens originally from Cape Verde.  While they understand English, they do not speak it fluently and converse in their native language, Creole.  They testified at trial through an interpreter.

The plaintiff Angela Barbosa is the daughter of Manuel and Henriqueta Barbosa. At the time of trial, she was 24 years old.  Angela was born in Cape Verde, but came to America as a child and is fluent in English.  On November 8, 2008, Angela gave birth to Jezmany Andrade, by cesarian section, and at the time of the incident she was staying at her parents' home to recuperate.  Jezmany's father, John Andrade, was also staying there to help out with the baby.

The plaintiff Maria Barbosa is also the daughter of Manuel and Henriqueta Barbosa.  At the time of trial she was 26 years old.  Maria is fluent in English.  On the date of the incident, Maria had left her parents' home before the police arrived, and was at the home of another sister, Nilda Barbosa.  Maria's claims arise out of events that transpired at the Brockton Police Department after the incident at her parents' home.

### 22 Leavitt Street

On November 15, 2008, the Barbosa family was gathered at the home of Manuel and Henriqueta for a Nota Sete, a Cape Verdean traditional celebration held seven days after a child is born.  It was a small gathering of about 15 family members and friends, half adults and half children ranging in age from the newborn Jezmany to a 9 year old.

At the time of the incident, Manuel and Henriqueta had seven grandchildren, and it had been expected that five would sleep over that night.

The Barbosas' home is a well-maintained single family home in a residential neighborhood.  There is a front door with a doorbell on Leavitt Street, and a side door with a doorbell on Hazel Street.  To get to the side door, you have to walk up some stairs onto a back porch.  (Exhibit ("Ex.") 4).

When you come into the home from the side door, there is a small vestibule and then, off to the left, is a dining room area, with a table surrounded by chairs.  (Exs. 5, 8). The refrigerator is also in the dining room.  (Ex. 8).  Through the dining area is a small galley kitchen with a sink, stove, dishwasher and cabinets along one wall.  (Exs. 9, 10). There is not enough room for the refrigerator in the kitchen.

4

There is also at least one bedroom on the first floor of the home.  On the second floor there are additional bedrooms and a room used as a living room.  At the time of the Nota Sete, there was a disc jockey playing records in the living room upstairs.

### The Noise Complaint

At the Nota Sete, food was served to the family, including soup, finger food and desserts.  There was beer in the refrigerator and some of the adults had some beers to drink.  Prior to the entry of the police, as discussed below, however, there is no evidence that the participants in the party were rowdy or in any way unruly.

On November 15, 2008, the defendant Thomas Hyland was working the midnight to 8 a.m. shift at the Brockton Police Department.  Officer Hyland was a 15 year veteran of the Brockton Police Department.  Officer Hyland was partnered with the defendant Brian Donahue, and they were riding in one car.[1]

A 911 call came in at around midnight from a resident at 30 Leavitt Street in Brockton.  (Ex. 17).  According to the female caller, her neighbors across the street who had "just bought the house" were "blasting" music.  (Ex. 13).  It is unclear to this court whether the caller was actually complaining about noise coming from 22 Leavitt Street, since the Barbosa family had been living at the home since 1988, and were not new neighbors.  In addition, the defendant Officer Jesse Drane testified that when he arrived

---

[1] Officer Donahue did not testify at trial.  Plaintiffs conceded that there was no evidence that Officer Donahue used excessive force against any of the plaintiffs.  They are, however, pursuing the case against him for illegal entry.

on site, he heard loud music.[2]  However, as detailed below, Officer Hyland testified that the music had been shut off at 22 Leavitt Street by the time Officer Drane arrived.  One way of reconciling this conflicting testimony is to conclude that the music may have been coming from another location.  However, that issue does not need to be resolved.  I do find that there was music being played by a disc jockey on the second floor of 22 Leavitt Street and that it could be heard from the street.

According to the police log, about one hour after the neighbor's call, at approximately 1:13 a.m., Officers Hyland and Donahue were dispatched to the scene.  Officer Hyland reported his arrival at a little after 1:14 a.m.  (Ex. 17).

Upon their arrival at the street near 30 Leavitt Street, Officers Hyland and Donahue parked on Leavitt Street and walked toward 22 Leavitt Street.  According to Officer Hyland, he heard loud music coming from the second floor of the house through an open window.  He could not identify the music, other than to say it had a bass beat.  He did not hear any vocals.

The officers did not go to the front door of the house, and did not ring the front door bell or knock on the door.

The officers went directly to the side door by going up the stairs and onto the porch.  Officer Hyland admits that the officers did not knock on the door, and that he did

---

[2]  The defendant Jesse Drane is a 20 year veteran of the Brockton Police Department where he serves as a patrolman.  Officer Drane testified at trial.  In many significant respects, his testimony differs from that of Officer Hyland.

not have consent to enter the premises.  He also admits that the police did not ring the

bell for the side door even though it is clearly visible.  (Ex. 5).

For the reasons detailed more fully below, I find that Officers Hyland and

Donahue entered the home at 22 Leavitt Street without probable cause, in violation of the

home owners' Fourth Amendment rights.

## A Call For Backup?

Although not argued by either party, it seems to this court that there is strong

circumstantial evidence that Officer Hyland called for backup before he even entered the

house.  Officer Shane Cantone, the dispatcher on the night of November 16, 2008,

testified that the dispatch log (Ex. 17) shows that Officer Hyland logged in as arriving at

22 Leavitt Street by 1:14 a.m.  Although there is no record of the time of the call for

backup, the log shows that by 1:18, Officer Drane was en route to provide backup.

According to Officer Drane, he understood that he was coming to the residence to clear

the house.  Consequently, the call for backup had to come in the four minutes between

1:14 a.m. and 1:18 a.m.  By 1:20 a.m., the first of six backup cars arrived.  Sergeant

Lofstrom arrived at 1:20 a.m., Officer Celia arrived at 1:21:57, Officer Dube arrived at

1:22:01, Officer Drane arrived at 1:24:20, Officer Almeida arrived at 1:25:01, and

Sergeant Maker arrived at 1:25:04.

As detailed below, Officer Hyland testified that he engaged in various conversa-

tions both inside and outside the house, went upstairs and engaged in conversation with

the disc jockey, who shut off the music and produced identification, and came back

7

downstairs and engaged in further conversations and obtained the homeowner's identification, all before he decided to call for backup.  It is difficult to imagine that Officer Hyland engaged in all of these activities in less than four minutes.

Moreover, even accepting Officer Hyland's testimony as to what he encountered in the house to be true, it was unnecessary for six other patrol cars to be dispatched to the scene.  It seems more likely that so many cars were dispatched in anticipation of trouble, not in response to what Officer Hyland actually encountered.

Finally, Officer Drane testified that he heard the music when he arrived, and that he was in the house before Officer Hyland went upstairs where the music was located.  Such testimony would be consistent with Officer Hyland calling for backup before he entered the house.

In any event, I find, based on my observations of the witnesses, that Officer Hyland arrived at the house anticipating problems with the occupants and acted accordingly.

### Police Entry Into The Home

Upon his arrival at 22 Leavitt Street, Officer Hyland noted some beer bottles lined up on the porch.  There is no evidence as to how many beer bottles, but the evidence is that they were lined up as if placed on the porch, not strewn about.  Thus, it does not appear that the party had been taking place outside.

Officer Hyland testified that from the porch he could see that persons inside the house, who were either standing or sitting around a dining room table, had glassy and/or

8

bloodshot eyes. Given the layout of the property, and based on my observations of the witnesses, I do not find this testimony credible. While it is perhaps possible that Officer Hyland may have been able to see people in the dining room, I do not find it credible that he could see that they had glassy and/or bloodshot eyes from outside the house.

Officer Hyland testified that he has responded to an "exorbitant" number of loud music calls. His general procedure is to enter a house with the cooperation of the home-owner, find "the literal source of the music," "get their information and tell them that I am going to have to charge them with disturbing the peace, at which point 100 percent of the time . . . they shut it down" since no one wants to be charged. (See Tr. III:22). This is not the procedure he followed in the instant case.

The side door of 22 Leavitt Street had both a glass storm door and a wooden door. According to Officer Hyland, both doors were wide open when he got there. According to the Barbosa witnesses, the doors were closed when the officers arrived.

I find credible the Barbosa witnesses' testimony that at least the glass door was closed when the police arrived, at around 1:00 a.m. Given the lateness of the hour, the fact that it was November, the fact that there were children in the house, and based on my observation of the witnesses, I find it more likely than not that at least one of the doors was closed to the outside.

Officer Hyland admits that he had no probable cause to enter the house, and he made no attempt to get consent to enter before he came in. It is undisputed that the

officers did not have a warrant to enter the house.  Officer Hyland admits that there were

no exigent circumstances justifying the officers' entry into the house.

Officer Hyland testified that he stood at the threshold of the doorway and he

announced police, but got no response.  He testified that he announced police again and

then stated that the music has to be turned down, to which an unidentified male

responded from inside the house that "the music was only going to be turned up when

you leave." (Tr. III:19).  Since no one got up to shut off the music, according to Officer

Hyland he and Officer Donahue walked into the house, and Officer Hyland went upstairs

and confronted the DJ.

The Barbosas testified that the first they knew of the officers' presence was when

the officers walked into the dining area where several adults were seated around the table.

Angela and Nilda were in the dining area, and Henriqueta was in the kitchen washing

dishes.  Manuel had gone to bed and was in a bedroom on the first floor.  None of these

witnesses heard the police announce themselves before entering the house.  Nor did

anyone hear the alleged statement about the music being turned up once the officers left.

I find that Officers Hyland and Donahue entered into the house before engaging in

any conversation with anyone from the house, and before announcing themselves.

Given that the officers did not attempt to knock on the door or ring the doorbell, I

do not find it credible that they stood outside the door attempting to engage anyone in

conversation.  If there were people easily visible from the "threshold" of the door, there is

no reason why the police would not have knocked or rung the bell.  Moreover, there is a

vestibule and wall directly in front of the outside door.  (Ex. 5).  You have to look at a diagonal through the vestibule to speak to anyone in the dining room.  (Ex. 8).  It would be much easier to speak to someone from inside the house than from the porch.

I also find that the officers did not loudly announce themselves, nor did they give anyone in the house an opportunity to turn down the music before entering.  If, as Officer Hyland contends (although I do not credit), someone said that the music was going to be turned back up after he left, this would have been an ideal opportunity for Officer Hyland to engage in his usual practice of informing the occupants that they would be charged with disturbing the peace if the music was not turned down.  According to Officer Hyland, this threat always resulted in cooperation.  It is undisputed that he did not engage in any such colloquy when he went to the Barbosas' home.

Instead, Officers Hyland and Donahue simply walked into the house.  Officer Hyland went up the stairs without consent.

According to Officer Hyland, when he went upstairs, he had to work to get the DJ's attention since he was wearing headphones and the music was loud.  Once he got the DJ's attention, he demanded that the DJ produce identification.  According to Officer Hyland, once he got his attention, the DJ was cooperative and gave him identification.  In fact, the DJ went beyond Officer Hyland's request to turn the music lower, rather, he shut it down completely and packed up the equipment.  The music never went back on.

**<u>Events After The Music Was Turned Off</u>**

11

While Officer Hyland went upstairs, Officer Donahue asked Angela who owned the house. Angela told him that her mother did, and translated the conversation for Henriqueta.

Officer Hyland testified that he also wanted to find out who owned the home in case he had to come back if the music got turned up again. Therefore, he wanted identification from the homeowner. At his request, Angela Barbosa told her mother, in Creole, that Officer Hyland wanted her to produce identification.

Henriqueta was very cooperative. She went and got her purse and showed Officer Hyland various forms of identification. Officer Hyland was satisfied with the identification. He also testified that Henriqueta was not inebriated. Nevertheless, he did not leave immediately. As detailed herein, I find that the officers' conduct caused matters to escalate, despite the fact that they had entered the home without consent, and certainly had no reason to remain once the music was turned off and the DJ had packed up the equipment to leave.

Officer Hyland immediately ordered all the people who did not live in the house to leave. Most of the adults left without incident or fuss after Officer Hyland told them that the "party was over" and that they had to leave if they didn't live there.

Other than the police officers' unilateral decision to break up the party, there does not seem to have been any reason to take this aggressive posture. There were not many people in the house. The music was turned off and the DJ had packed up the equipment. The home owner was cooperative and had turned over her ID. The homeowner was

12

admittedly not inebriated.  Officer Hyland had not seen any illegal activity or any children in distress.

Nevertheless, Officer Hyland contends that he gave "a legal order" that everyone should leave because he couldn't "maintain the peace if the party is going to continue." (Tr. III:57).

Most, if not all, of the adults except Henriqueta and Manuel, Angela who was staying with her baby, John Andrade, the baby's father, and Nilda, another daughter, left. This, however, did not satisfy the police.

As Nilda testified, Officer Hyland was "frustrated and angry" and he demanded that everyone leave.  He told the guests to "get the fuck out."  I find this testimony credible.

Officer Hyland testified that he heard a female voice say "you don't know what you walked into" and you "better be careful."  (Tr. III:37).  At this point Officer Hyland testified that he made the decision not to leave, although he did not feel personally threatened by these statements.  Again, no one corroborates hearing these comments. Nevertheless, given that there was no reason for the officers to remain in the home, I do not find that these statements, if made, warranted further intrusive actions by the officers.

Officer Hyland testified that he saw John Andrade look at Officer Donahue and say words to the effect of "why were you grilling me," "you don't have any power in this house and get the fuck out."  (Tr. III:43).  Everyone understood that "grilling" meant staring.  Officer Hyland testified that Andrade and other people were saying things like

13

"you don't have any right to be here.  You don't have a warrant.  You didn't knock.
What are you doing here?  This is just a family celebration."  (See Tr. III:45).  People
were complaining about having the music turned off.  Officer Hyland expressly
remembers someone saying you don't have a warrant.  I find that, even assuming that
these comments were made, they were entirely appropriate given the way the police
entered the home.  I also find that Officer Hyland knew that he had walked into a family
celebration.

Apparently, Officer Hyland was unwilling to accept this challenge to his authority,
and he decided not to leave.  Admittedly, no one had threatened the police officers, and
no one prevented them from leaving.  According to Officer Hyland, the music had been
turned off by this time.  Nevertheless, according to Officer Hyland, although he was not
in imminent fear for his safety at all, he decided to call for back up at this point due to the
"potential hazard" to himself.  (Tr. III:44).  As detailed above, regardless of when he
made the call, within minutes of his arrival six police cars responded.

## The Application Of The Community Caretaking Doctrine

At trial, Officer Hyland testified that while his primary purpose in entering the
house was to have the music turned down, his "secondary" purpose was to insure the
safety of the children inside, as a result of which he did not leave even after the music was
turned off, and even after most of the people present had left when he ordered them to do

so.  I find this testimony to be a fabrication in an attempt to fit within the "community

caretaking" doctrine, which allows for warrantless searches under certain circumstances.[3]

I find that the officers entered the house without consent for the sole purpose of

shutting off the music.

At his deposition, Officer Hyland testified as follows:

> Did I feel that I had the right to enter the house without a warrant
> based on a caller saying they were disturbed?  No.  However, I did
> enter that house to stop the music because the time that it would take
> to obtain a search warrant to merely get into a house to quell a
> disturbance would be unreasonable based on the fact that it would
> take so much time, that the disturbance would go on and that it would
> make it so that the police that the police are impotent to perform their
> duties, so I felt justified going into the house and merely having the
> music stopped or at least lowered.

(III:24; Ex. 14 at 36).

Officer Hyland was given several other opportunities at his deposition to explain

why he entered the house without consent or a warrant.  Each time he stated, as above,

that his purpose in entering was "to quell the disturbance" or words to that effect.  (Ex. 14

at 33; see also id. at 34-35 ("when I couldn't get cooperation from anybody that was inside

that home to have that music stopped, that's when I decided I will go to the source of the

music myself, make sure the disturbance is quelled.")).  He never expressed any concern

about the children present.

---

[3]  Like plaintiffs' counsel, I do not use the word "fabrication" lightly.

In addition, at his deposition, Officer Hyland was given the opportunity to explain why he remained in the house after the music was turned down.  Again, he made no mention of any concern about the children.  As he testified in response to an inquiry as to why the homeowner had to produce her identification for him after the music had been turned down:

A.      ... I asked her for it because she would be charged and she was subject to arrest on anticipatory breach of the peace if she did not give me that name and date of birth, so I did want that so that we weren't impotent leaving there.

Q.      Did you just use the phrase "anticipatory breach of the peace"?

A.      Yes.

Q.      Did you make that up?

A.      No, I have heard that before.

Q.      Is that a crime on the books of the Commonwealth of Massachusetts?

A.      I believe so.

Q.      Anticipatory breach of the peace?

A.      I have arrested people and charged them –

Q.      I could be wrong.  I'm no criminal expert.  I just never heard it before.

A.      Okay.

Q.      So the reason that you remained in the house was to establish the identity of the homeowners in case you had to charge them with anticipatory breach of the peace.

A.      Yes.

Q.     That's your testimony?

A.     Yes.

(Ex. 14 at 52-53).  Again, no mention was made of any concern for the children.

Officer Hyland was also given the opportunity to add anything he wanted at the deposition "in terms of helping us understand what happened in the house that night" and he testified that "we've covered everything."  (Ex. 14 at 83-84; <u>see</u> <u>also</u> <u>id.</u> at 88 ("Is there anything else you would like to tell me about this incident?  A. Not that I can think of, sir, no.")).  At no time did he testify about having any concerns about the welfare of the children inside.[4]

Nevertheless, at trial Officer Hyland testified that he could not leave the house after the music had been turned down because he "couldn't" and "wouldn't walk away" because there were children and intoxicated adults and he "needed [to] make sure those children were being cared for properly without just walking away from it."  (Tr. III:31).  "There were potential hazards from my training and experience that based on people – children being supervised by adults who are in my opinion intoxicated, that could

---

[4]  I also note that while the defendants moved for summary judgment on May 31, 2013 on the grounds of qualified immunity, they did not raise the "community caretaking doctrine."  In fact, their statement of material facts makes no mention of any children at all.  (Docket No. 44).  They justified the entry into the house on the basis that Officer Hyland was "[f]aced with the possibility of having to return to the house on repeated occasions to deal with the loud music that was disturbing the peace of neighbors."  (Docket No. 42 at 6).  It was not until July 12, 2013, after a recent decision by Judge Stearns applying the doctrine, that the defendants moved for summary judgment based on the community caretaking doctrine.  (Docket No. 78).  This court denied the motion as untimely and because the facts as alleged did not invoke the doctrine. (Docket No. 79).

definitely raise a problem for children pose some kind of hazard.  I wasn't sure what I was dealing with at the time."  (Tr. III:41-42).  At his deposition, however, he did not recall if there were children present after he came down from upstairs.  (Ex. 14 at 47).  Moreover, none of his actions exhibited any concerns about the well being of the children.

Officer Hyland has no memory of how many children he saw when he entered the home, their genders or their ages.  He admitted that none of them seemed to be at risk. (Tr. III:33-34).

After he came from downstairs, Officer Hyland wanted all the adults to leave — he expressed no concern about where the children were or who was taking care of them.

Officer Hyland testified that Henriqueta was not intoxicated.  The fact that he had determined that she was the owner of the house, and was not intoxicated further negates any contention that he had continued concerns about the children's well-being.

Officer Hyland's actions were also inconsistent with someone concerned about the children's welfare.  He never interviewed the children, he never asked anyone about the children and, although he called for backup, he did not call for help with the children.  He has no idea how many children were there, how many left with the other adults, or any-thing else about them that would indicate a concern about their well-being.

Based on these facts and my observations of the witnesses, I find that Officers Hyland and Donahue did not enter or remain in the house for any reasons supported by the community caretaking doctrine.

**John Andrade's Arrest**

The baby's father, John Andrade, refused to leave voluntarily despite Officer

Hyland's demand that he do so.  Andrade was staying at the house to help with the baby.

Andrade was demanding an explanation and refused to go outside when the party

was cleared out.  Officer Hyland continued to demand that he leave.  According to Officer

Hyland, Andrade retreated into the galley kitchen, crossed his arms and refused to leave.

Henriqueta was in the galley kitchen washing the dishes.

Officer Hyland testified that he arrested Andrade because he had refused to leave

the house when ordered to do so, and because he "had created a disturbance" by, inter

alia, simply being present at the party where there was loud music.  There is no evidence

that Andrade engaged in any other disruptive behavior, other than challenging the officers'

authority to demand that he leave.  This is confirmed by Officer Drane, who testified that

he did not see Andrade do anything that warranted being arrested.

Officer Hyland testified that he arrested Andrade because he "believed that John

Andrade was going to assist in committing the crime of breaching the peace" because the

music would be turned up after he left.  (Tr. III:58).  This alleged concern, however, is

inconsistent with Officer Hyland's testimony that the DJ already had packed up the music.

Once Officer Hyland decided to arrest Andrade, who was staying in the house with

the permission of the owner, it appears that things got out of control rapidly.  While there

was no direct testimony on this point, the situation was undoubtedly complicated by the

19

arrival of six more police cars filled with officers who were milling around either inside or outside of the house.

According to Officer Hyland, while he was trying to arrest Andrade he felt "something slam into – significant weight slam into the top of my head from behind." (Tr. III:64).  At that point he released Andrade, who was pulling his arm away.  He doesn't remember if he had handcuffed Andrade at that point.  He released Andrade to Officer Dube who escorted him out.

I find that there was a scuffle in the kitchen with Andrade before he was arrested. As detailed below, I find credible the testimony of Henriqueta, as confirmed by Manuel, that Andrade and Officer Hyland knocked into Henriqueta during Andrade's arrest.

Although the record was not introduced at trial, Andrade apparently was charged with disturbing the peace and disorderly conduct.  (Ex. 14 at 69-70).  It does not appear in the record whether the charges against Andrade were dismissed, like all the others arrested at the house.  Andrade is not a party to this action and did not testify at trial.

### Henriqueta's Arrest

Although Officer Hyland didn't see what hit him while he was attempting to arrest Andrade, he heard a "smash" and saw silverware hitting the floor.  When he turned around after being hit he saw Henriqueta holding what appeared to be a dish strainer, and he believes that Henriqueta slammed it into the back of his head.

According to Officer Drane, he saw Henriqueta come up behind Officer Hyland and take a silverware strainer, "just take it over her head, crash it right over . . . the back of Tommy Hyland's head." (Tr. III:180).

Henriqueta denies hitting Officer Hyland with the strainer (or anything else) and testified that when Officer Hyland was attempting to arrest Andrade, there was a scuffle and they bumped into her and the silverware went flying. I accept this testimony as true, as well as her testimony that she was trying to explain that Andrade did not have to leave the house, because he was helping her clean up and was the baby's father. Things were happening very fast, and Henriqueta was upset and speaking in Creole, and/or broken English, which accomplished nothing. Manuel, who had come out of his room at this point after hearing loud voices speaking English, also saw Andrade and a police officer fall on his wife while Andrade was being arrested. Manuel was also demanding an explanation, in Creole, about what the police were doing in his house. However, he was being ignored.

I find Henriqueta's testimony credible. I do not find it credible that Henriqueta, who is approximately 5 feet tall, hit Officer Hyland, who is over 6 feet tall, in the head with the strainer. I find it much more credible that in the confusion with the arrest of Andrade, Henriqueta was knocked into and the silverware went flying.

Officer Hyland did not receive any medical treatment for any injuries arising out of the incident. Officer Hyland did not collect the strainer or any silverware as evidence.

21

After Officer Hyland released Andrade to Officer Dube, he proceeded to arrest Henriqueta.  I find that he used excessive force in this arrest.

As noted above, Officer Hyland did not see Henriqueta do anything to him. Apparently, however, she was very distraught by the arrest of Andrade.  Instead of de-escalating the situation and trying to speak with her, Officer Hyland arrested her. Henriqueta was charged with assault and battery with a dangerous weapon, disorderly conduct, disturbing the peace, interference with a police officer and resisting arrest. (Ex. 11).  As discussed below, these charges were either dismissed or she admitted to sufficient facts in exchange for the charges being continued without a finding and dismissed after six months probation.[5]

In arresting Henriqueta, according to Officer Hyland, he "spun" her around and handcuffed her with her hand behind her back while she was up against a wall.  He grabbed her by the arms and "walked" her to the cruiser.  He had his left hand on the "meaty" portion of her arm, and his right hand on her wrist or handcuff, and she was escorted out.  According to Officer Hyland, Henriqueta "became limp" when she was taken out onto the porch and fell to the floor in "passive resistance."  Another officer assisted her back up to her feet and she walked to the cruiser.  (See III:74-75).

---

[5]  As detailed below, I also reject the defendants' contention that by admitting to sufficient facts of assault and battery with a dangerous weapon, Henriqueta admitted to hitting Officer Hyland with the strainer.

I accept as true the testimony of Henriqueta and her daughters that Officer Hyland treated Henriqueta roughly and that she banged her shoulder on a door or wall after being "spun around," handcuffed and slammed against a wall. I find that while Henriqueta was yelling, she did not engage in any physical altercation with Officer Hyland and her conduct did not warrant her being treated roughly or slammed against a wall. I also accept her testimony that she tripped and fell while being dragged or pushed outside, and that she did not intentionally go limp. I further find that Henriqueta could not get up because she was handcuffed, and that she was lifted to her feet by a police officer.

Henriqueta testified at trial that she wet her pants while being arrested, and that she had to remain in wet clothes through the booking process. She did not testify to this earlier, and I find that, even assuming it occurred, Henriqueta did not notify anyone that her pants were wet during the incident or thereafter.

Henriqueta did not introduce any medical evidence of treatment for injuries allegedly sustained during the arrest. She did testify, however, that she suffered pain in her shoulder, which felt broken. I find this testimony credible. She also testified that she suffered and continued to suffer emotional distress after being arrested, including being fearful of either being home alone or going places alone. I also find this testimony credible.

By the time Officer Hyland arrested Henriqueta, the few remaining adults in the house were quite angry. This included Manuel, Angela and Nilda. They were yelling that this was a party and questioning what the police were doing there. While I find that the

23

plaintiffs may have exaggerated the swearing and racial epithets in which the officers engaged, I do find that both sides were yelling at each other and that both sides were cursing at each other.

Even assuming, arguendo, that the police are entitled in certain circumstances to respond to verbal challenges to their authority by arresting people, in the instant case they seem to have completely forgotten that they were in someone's home, with people who were lawfully entitled to be there. The police conduct in failing to leave and engaging in confrontation with the few remaining adults is even more unacceptable given the undisputed fact that the music had stopped, and there was no disruption of the neighborhood's peace and quiet, except, perhaps, the disruption caused by the fact that six additional police cruisers had been sent to break up a small family party.

### Angela's Arrest

Seeing her mother arrested and dragged outside upset Angela considerably. She rushed over to assist her mother. According to Officer Hyland, while running over towards him Angela threw what appeared to be a red phone which hit him in the calf. Angela denies throwing anything at Officer Hyland. She also denies owning a red phone.

Officer Hyland did not receive any medical treatment for any injuries arising out of the events at issue. He did not seize the phone as evidence.

Officer Drane testified that he grabbed onto Angela because she was yelling and swearing. He testified that he "took her by the arms," and "placed her against a chair or something, just to maintain control of her[.]" (III:180-81). He cuffed her and took her out

24

of the house.  At some point Officer Drane heard someone say either that Angela was

pregnant or had a C-section.

According to Officer Drane, he handcuffed Angela for his protection because she

was flailing around.  He grabbed her collar while walking her out to the cruiser, and "there

was some hair attached with the collar[.]"  (Tr. III:184)  He testified that he first grabbed

her by the blouse, but he was afraid "it might have come off, or whatever, so I grabbed her

by the handcuffs and by the back of the collar which had some hair to it.  I led her out the

door of the house to the cruiser while she was screaming and yelling, swearing and calling

me names."  (Tr. III:184).  At his deposition, Officer Drane had testified that because

Angela was resisting arrest, he needed to exert "a little more pressure to gain control" and

apply the handcuffs and that he had "grabbed her by the back of the hair to gain control[.]"

(III:188-90).

Officer Drane testified that he is African American and his wife is from Guatemala.

He denies ever calling Angela "an immigrant bitch" or making other racial comments

attributed to him.

Angela admits to yelling when the police arrested her mother, and to cursing at

Officer Drane, using racial epithets.  She testified that Officer Drane suddenly arrested

her, grabbed her by the back and slammed her to the floor, where she was handcuffed.

She was then dragged by the hair and arms out of the house.  Angela testified that she was

yelling that she had just had a C-section and was in pain.  She further testified that while

25

she called Officer Drane names, he was also swearing at her.  I find Angela's testimony to be credible.

Specifically, but without limitation, I find that Angela did not throw the phone at Officer Hyland.  I find her testimony that she did not own such a phone credible.  Given that Angela admitted to yelling and cursing at Officer Drane, I find that she would have admitted throwing the phone if she had done so.  In Angela's mind, she was coming to the rescue of her mother, and I find that she would have admitted to taking steps to protect her mother if she had done so.

I find that Officer Drane used excessive force in arresting Angela.  I find that he heard (probably from her) that she had recently been released from the hospital after having undergone a C-section, yet he took no steps to limit his physical handling of her during her arrest.  I find that Officer Drane did grab her by the hair and slam her either against a chair or to the floor, where she was handcuffed.  I also find that she was treated very roughly, being pushed and shoved outside into the police cruiser.

I find that while Angela was yelling, she did not physically engage with Officer Drane.  I find further that Angela's conduct did not warrant her being treated roughly during the arrest.

In a rather remarkable case of overcharging, Angela was charged with assault and battery with a dangerous weapon, interfering with a police officer, resisting arrest, disorderly conduct, inciting a riot and intimidating a witness.  (Ex. 7).  No probable cause was found for the intimidation charge.  The disorderly conduct and inciting a riot charges

were dismissed, and she admitted to sufficient facts to the other charges in exchange for a

continuance without a finding and one month of probation, after which the charges were

dismissed.[6]

In addition, Angela had to write a letter to Officer Drane, which read in full as

written as follows:

> To Officer Jesse Drane,
>
> I Angela Barbosa wants to apoligize to you and the Brockton Police
> Department regarding the incident that accord on 11/16/2008.  I'm
> very sorry and it won't happen again.
>
> > Thank you.
> > Angela Barbosa

(Ex. 2).  Angela testified that she wrote this letter to apologize for swearing at Officer

Drane, not for throwing the phone.  I find this testimony credible.

Angela testified that she was bleeding from her C-section and was in much pain

after the arrest.  Her arms and feet were scraped.  I find this testimony credible.  Angela

also testified that she suffered and continues to suffer emotional distress as a result of the

---

[6] As detailed below, I do not find that by admitting to sufficient facts to an assault and
battery with a dangerous weapon charge Angela admitted to throwing the phone.

Case 1:11-cv-11997-JGD   Document 98   Filed 12/02/13   Page 28 of 73

incident, has trouble sleeping and is fearful of the police.[7] I find this testimony credible as well.

Angela did not submit any medical records evidencing any treatment she may have received as a result of injuries sustained during the arrest.

### Manuel

Manuel was in the bedroom when the police arrived at his home. He came out when he heard English being spoken, which was unusual in the house. He does not drink and was not inebriated.

Manuel came out of the bedroom to see Officer Hyland cuffing Andrade, and the two of them falling against Henriqueta. He saw Henriqueta getting arrested and saw the police dragging and hitting her. They then threw her at the door and then out on the porch.

Manuel felt "impotent" because he could not intervene with the police because he respects authority.

As a result of the incident, Manuel has had trouble sleeping and is nervous. His relationship with Maria has become strained, and Henriqueta cries a lot. His status as

---

[7] Angela was questioned by defense counsel as to whether she had been arrested by Brockton police on "numerous occasions," implying that there are other reasons for her bad relationship with police. However, there does not seem to be any factual support for such questions. The only evidence before this court is that Angela was arrested once before this incident in connection with a fight with Andrade, and that the charges were dismissed. No criminal records were offered into evidence. I do not find that Angela suffered any emotional distress as a result of this prior arrest.

head of the household has been undermined, and he is very depressed.  I find this

testimony credible.

### Events Following Henriqueta's and Angela's Arrest

Andrade, Henriqueta and Angela were transported to the Brockton police station.

As is customary with all arrestees, they were handcuffed to a railing in the garage to await

booking.

While there Angela was yelling, including yelling that she needed medical

attention, and, by her own admission, was swearing at the officers.  I find that her requests

for medical treatment were ignored.

I find credible the testimony of Angela and Henriqueta that while they were hand-

cuffed to the railing, an officer walked by with a sandwich and taunted them by asking if

they wanted some food while they were handcuffed.  I also find credible the Barbosas'

testimony that derogatory statements were made about their immigrant backgrounds.  I do

also find, however, that their description of the comments may be exaggerated.

While Angela and Henriqueta were awaiting booking, as discussed below, Maria

was arrested and brought to the garage and handcuffed to the railing as well.  Angela and

Henriqueta saw bruising on Maria's face that had not been there before.

Angela, Henriqueta and Maria were eventually transported from the police station

to Brockton Hospital by ambulance.  Either Nilda or a female police officer had called the

ambulance.

Angela testified that she was seen at the Brockton Hospital that evening and discharged, and was seen by her own doctor soon thereafter.  She was ordered to continue taking the pain medications she had been prescribed for her C-section.  As noted above, she did not introduce any medical records reflecting any treatment following her arrest.

Angela testified that she recovered physically in a few months, but that she continues to have nightmares, trouble sleeping and she is unable to trust the police.  Angela has not sought any professional help for emotional issues.  I find Angela's testimony credible.

Henriqueta also went to Brockton Hospital by ambulance after she was released.  She was suffering from pain in her shoulder, neck and arm, which got worse later.  According to Henriqueta, she was kept in the hospital overnight, and prescribed pain medicine, which she continues to take.  She testified that she still has difficulty turning her neck, which has prevented her from driving.  As noted above, she did not introduce any medical records reflecting any treatment following her arrest.  While I accept Henriqueta's testimony concerning her physical injuries immediately following her arrest, she has not met her burden of proving any permanent physical injury.

Henriqueta testified that she is still afraid to be alone in her house, or to venture outside to the store or anywhere else on her own.  She has had a camera installed on the door of her house because she is so afraid.  Henriqueta has not sought any professional help for any emotional issues.  I find Henriqueta's testimony about her emotional distress to be credible.

30

## **The Missing Videotape**

As detailed below, Maria was arrested after she came to the Brockton Police Station to check on her sister and mother.  The next day Maria filed a citizen's complaint concerning the events surrounding her arrest.

There was a videotape covering Maria's interactions with the police in the lobby of the police station and the events surrounding her arrest.

Although the Brockton police knew about Maria's complaint, and the Internal Affairs Department ("IAD") allegedly reviewed the tape before responding to Maria's complaint denying any wrongdoing, no steps were taken by the police to save the tape.

Emanuel Gomes was the head of IAD in November 2008.  He testified that he did not instruct the officer in charge of the investigation to preserve the tape.  He testified further, however, that the preservation of the tape was such a fundamental task in an IAD investigation that the officer should have known to do so without instruction.

According to Captain Gomes, he was told that the tape was taped over.  However, there was no testimony from the officer who allegedly determined that the tape was no longer available.

There was no evidence concerning how the surveillance system worked.  However, given that the tape was allegedly segregated and viewed by the officers conducting the investigation of the events that transpired with Maria, it is unclear how it would have been taped over.  This is not a situation where no one reviewed the relevant portion of the tape

and it was just recycled in the normal course of events.  Moreover, the failure to preserve the tape violated the police's own internal policies.

As a result of the destruction of the tape, Maria was forced to defend herself against the officers' version of her arrest without the benefit of a critical piece of evidence.  I find that an adverse inference should be drawn from the Brockton police's failure to preserve the tape under the doctrine of spoliation of evidence described below.

## Maria's Arrest

At the time of the incident on November 15, 2008, Maria was living at her parents' home.  She attended the party for awhile, but left around 9 p.m. and went to sleep at her sister Nilda's apartment.

Nilda called and woke her up, and told her that the police had gone to the house and "attacked" her mother and Angela.

Nilda and a friend named Gerard picked Maria up at the apartment, and they all went to the police station to find out about Angela and Henriqueta.

Coming into the police station through the west door, from the parking lot, there are glass doors that open into a small vestibule, and then another set of glass doors that slide open automatically when you approach them from either side.  There is a long corridor and a duty officer is stationed at the information window at the end, which is in a glass enclosure.  There is a wooden bench against one wall in the lobby.

Nilda and Maria testified that Nilda first approached Officer Steven Johnson who was at the information window.  However, he ignored her.  Officer Johnson does not have

any memory of Nilda approaching him.  I find that while Nilda approached the window, Officer Johnson did not notice her.  I also find that at this point neither Nilda, Maria nor Gerard were causing any disturbance or being disruptive so as to call attention to themselves.

It is undisputed that Maria then approached Officer Johnson to inquire about her family members.  According to Maria, she expressed concern about Angela, who had just had a C-section, and her mother.  She wanted to know when they would be ready to leave.

According to Officer Johnson, Maria came screaming up to the window where he was standing, yelling and screaming that she wanted to bail people out and demanding the badge numbers of the police officers that had arrested her family members.  According to Officer Johnson, he was "shocked" and he didn't know what she was talking about.  He did, however, go to the booking area to find out some information.

Based on my observations of the witnesses, the fact that Nilda and Gerard admittedly did not cause any disruption, the fact that Officer Johnson himself admits that he was willing to leave Maria unattended when he went to find out about her family, and the fact that there is nothing in Maria's testimony or demeanor which indicated that she, herself, desired to be arrested, I find that while Maria was upset when she approached Officer Johnson, she was not yelling and screaming or otherwise causing a scene.

The parties also disagree as to what happened next.  According to Maria, Officer Johnson walked away without any explanation, and when he returned he told her to come back in one half hour.  She decided to stay and was going to sit down on a bench when

Officer Johnson came out of the information booth yelling at her to get out and using obscenities while he pushed her out of the door.  Nilda also testified that Officer Johnson demanded that they get out, using obscenities.

According to Officer Johnson, it takes 30-40 minutes to book a person if they are being cooperative.  Since Andrade was being booked, and Henriqueta and Angela were in the garage waiting to be booked, he told Maria that it was going to take 1-2 hours before bail could be set.  She did not like that, and was yelling obscenities as well.  He demanded that she leave.

I find it most likely that while Officer Johnson was giving his explanation of how long it would take, Maria understood that it would take 30 minutes in total, not 30 minutes per person, and she decided to wait.  For his part, Officer Johnson understood that it could take several hours, and did not understand why Maria was not leaving.  Consequently, Officer Johnson was encouraging Maria to leave and she did not want to.  I find that a verbal altercation ensued, with both sides using inappropriate language.

I do not find that Maria unilaterally escalated the matter into a screaming, unprovoked scene at the police station.  On the other hand, I do not find that Officer Johnson came screaming out of the information booth.

It is undisputed that Nilda and Gerard left without incident.

I find that Officer Johnson left his enclosure and walked towards Maria.  They were still arguing, but Maria was backing out towards the street.  At this point, the

commotion had attracted the attention of other officers, including Captain Gomes, Captain McCabe, Sergeant Celia and Officer Baez.  However, they did not intervene.

I find that if she had been allowed to leave the building, Maria would have left, as Nilda and Gerard were already outside.  I find that Maria made it through the first glass doors into the vestibule when Officer Johnson decided to arrest her.  At this point, he grabbed her arms.  Maria started yelling for him to get his hands off of her.  Things deteriorated rapidly from there, and Officer Johnson and Officer Baez grabbed Maria to place her under arrest.  As Captain Gomes testified, he saw the two officers lift Maria and take her to the bench to be cuffed — she was not walking on her own.

I do not credit Maria's and Nilda's testimony that Maria was already out on the street when the fracas started, or that Officer Johnson intentionally swung punches at Maria's face.  I do find, however, that Officers Johnson and Baez used excessive force in connection with the arrest.

Officers Johnson and Baez each weighed about 220 lbs at the time of the incident. Officer Johnson described Maria as weighing about 100 pounds "soaking wet."

According to Officer Johnson, he had the opportunity to observe Maria before the arrest.  She did not have any bruises on her face prior to her arrest.

I find that Officers Johnson and Baez grabbed Maria from the vestibule and slammed her down, face first, onto the wooden bench.  One of them pressed on her back while cuffing her hands behind her back.

As evidenced by the photographs taken shortly after her arrest, Maria suffered cuts and abrasions around her right eye, on her right eyelid and on her forehead.  She also had a black eye.  (Ex. 6A-C).

I find that Maria suffered these injuries during her arrest.

The defendants suggest that some of Maria's injuries may have been caused earlier in the day when she had an alleged "fistfight" with a woman named Sandy Antunes.  (See Defs. Proposed Findings (Docket No. 95) at ¶ 64).  There is no evidence to support such a finding.

Maria testified that earlier that day she had a fight with Sandy Antunes, a woman known to the Barbosas.  They were at a convenience store.  When Sandy grabbed a tomato can, Maria grabbed it from her and hit Sandy with it.  Maria was not hit.  Maria was arrested, and Sandy was not.  According to Maria, she was not injured during the altercation.

The defendants were given the opportunity by this court to locate Maria's booking photograph from that arrest to see if she was injured during this altercation, but they did not do so.  All the witnesses, including Officer Johnson, testified that Maria was not injured before her arrest at the Brockton police station.  Thus, there is no support for the contention that she may have been injured earlier in the day.[8]

---

[8]  I also credit Maria's testimony that she did not tell her family about the earlier arrest when she attended the Nota Sete.  Maria was immediately released after her arrest, and the family party was not the appropriate place to discuss the incident.

Captain (now Chief) Gomes and Captain McCabe witnessed Maria's arrest and did not intervene. However, I find that things happened too quickly to warrant their intervention.

I do find it noteworthy, however, that Captain Gomes was concerned that Nilda and Gerard, who had left, would vandalize the police cars outside. Consequently, he instructed Captain McCabe to make sure that they were off the property completely and that they did not vandalize the police cars.

There is no evidence that Nilda and Gerard had done anything at all to warrant the concern. I find that Captain Gomes' conduct is indicative of the preconceived distrust shown to the Barbosa family throughout this encounter.

After she was arrested by Officers Johnson and Baez, Maria was dragged to the garage where she awaited booking with the rest of her family. The charges brought against Maria are unknown to this court. They were all dismissed.

I find credible Maria's testimony that when she complained to the police officers while she was handcuffed that "they would pay for this," they responded by saying that the judge would only laugh at her. I also find credible that there were disparaging statements made by the police about Maria's immigrant status.

After being booked, Maria went to Brockton Hospital with Angela and Henriqueta by ambulance. In addition to the bruises around her eye, Maria was complaining about a number of bruises and aches to her head, face, neck, arm and other parts of her body.

After being seen by a nurse at the Brockton Hospital, Maria was seen at Good Samaritan

hospital in Brockton.  She continued to receive some medical treatment up until trial.

There was no expert medical testimony at trial.  Maria did, however, submit

medical records.  (Ex. 15).  There was no explanation at trial about the specific content of

any of the records.

Since the incident, Maria has complained consistently of migraine headaches,

anxiety, pain – predominantly in her eye and face, with some pain more recently in her

right arm and neck.  No physical cause of these symptoms have been found.

In January 2009, Maria saw her primary care physician ("PCP"), Dr. Joshi,

complaining of continuous headaches and eye pain.  On February 25, 2009, she was

assessed by a new PCP, Dr. Canda, with suffering from acute post-traumatic stress

disorder.  She was seen by a neurologist, Dr. Louie, on May 8, 2009 when she continued

to complain of pains in her head, not sleeping and worrying.  No physical basis for the

pain was ever found.  Maria continued to complain of migraines to Dr. Canda during visits

on October 22, 2009 and March 19, 2010.

From March 20, 2009 through May 20, 2009, Maria was seen at South Bay Mental

Health Center.  It appears that she was suffering from anxiety and depression, among other

things, which she attributed to the encounter with the Brockton Police.  It is unclear why

the treatment terminated.

On April 16, 2010, Maria was seen by a neurologist, Dr. Ho, of Tufts Medical Center.[9]  Maria continued to complain of migraines and pain in her eye.  While no physical cause was found, Dr. Ho prescribed a different pain medication.  He diagnosed her as suffering from "post concussive headache syndrome."  Maria's complaints remained unchanged during her visits with Dr. Ho on June 4, 2010, September 10, 2010, and November 26, 2010.  During this period, she was also seen by an opthamologist for her eye pain.  No physical explanation for her pain was ever found.

Maria was seen at the Beth Israel Deaconess Medical Center's Comprehensive Headache Center on January 6, 2011 by Dr. Wells.  Dr. Wells reported being "concerned that [Maria] may have post-traumatic headaches with migrainous features" with a "[p]ossible component of trigeminal neuralgia."  Dr. Wells further noted that Maria continued to have a lot of anxiety about the incident with the Brockton Police and recommended further psychiatric care.  Dr. Wells recommended to Maria that she should "see what she could do to resolve" the incident with the police.  Dr. Wells noted that

---

[9]  In his notes, Dr. Ho wrote to Dr. Canda:

> We had the pleasure of seeing your patient Ms. Maria Barbosa in the neurology clinic today with regards to her headache.  Thank you for the kind referral.  Ms. Barbosa is a pleasant 22-year-old right-handed woman who has been having headaches for the last 2 years ever since her assault in 05/2008.  In 05/2008 the patient was attacked and punched multiple times in the right face causing severe bruising and swelling.

(Ex. 15).  While the defendants suggest that this relates to a different incident in May 2008, I reject this suggestion.  The description of events mirrors Maria's description of her encounter with the Brockton Police.  Moreover, later records attribute her complaints to an incident on November 16, 2008.  (See Beth Israel Deaconess report of January 6, 2011).  I find that the May reference is a typographical error.

"[u]ntil she is able to get this unresolved incident resolved, it is possible that the pain will persist."  (Ex. 15).  There is no evidence that Maria followed up with any type of counseling.

Maria was last seen by Dr. Ho on May 25, 2012.  At that time, Dr. Ho noted that Maria's persistent headaches have been "somewhat difficult to control with medications." No follow up appointment was scheduled, although Maria was advised that she could call if she needed to see the doctor again.

Since the incident, Maria has attended Bunker Hill Community College.  She has worked as a service representative in a financial institution and a customer service representative.  At the time of trial, she was a college student and working part-time in sales.

### Events Following Maria's Arrest

On November 17, 2008, Maria filed a complaint with IAD.  (Ex. 16).  Therein, she complained that she was punched and assaulted during the arrest, and the police called her "ugly names" and used abusive language.  (Ex. 16).  While the details of the arrest are not precisely what she testified to at trial, the accounts are substantively similar.

On July 6, 2009, IAD sent her a letter saying that the investigation had been completed.  (Ex. 1).  The investigation was described as including Maria's written complaint, various written reports from police officers, and "a review of the police lobby surveillance video, and other department documents."  (Ex. 1).  Apparently there were no

interviews or attempts to ascertain Maria's version of events.  Chief Gomes described the investigation as "shoddy."  I concur.

The letter describes IAD's findings only as follows:

> After reviewing the facts and circumstances surrounding the incident, the Internal Affairs Division Investigation has disclosed that the officers were not involved in any misconduct.  An incident occurred but was lawful and proper.

> This matter is now a closed issue with the Internal Affairs Division of the Brockton Police Department.

(Ex. 1).  Thus, not only is the surveillance tape missing, but there is also no written description of what the tape actually showed.  As described above, Maria has been forced to defend herself without access to this critical evidence.

Henriqueta hired Attorney Frank Modanado to represent her, Angela, Maria and Andrade with respect to the charges brought against them in connection with their arrest on November 16, 2008.  He charged them $12,000.00, which was a lot of money for them to pay.  Attorney Modanado worked out agreements with the government.  It appears that the charges against Andrade and Maria were dismissed.

The charge against Henriqueta for disorderly conduct was dismissed.  (Ex. 11). She pleaded to sufficient facts to the charges of assault and battery with a dangerous weapon ("ABDW"), disturbing the peace,[10] interfering with a police officer and resisting

---

[10]  Since, as detailed below, disturbing the peace includes a public element, that charge must relate to the loud music, even though that was not the basis for either Henriqueta's or Angela's arrest.

41

arrest.  They were all continued without a finding, and Henriqueta was given concurrent six months probation and ordered to write a letter of apology to Officer Drane and Officer Hyland.  (Ex. 11).  There is nothing in the record before me concerning whether Henriqueta wrote the letter or what it said.  However, it does appear that Henriqueta completed her period of probation without incident.

The defendants contend that the fact that Henriqueta pleaded to sufficient facts to the charge of ABDW conclusively establishes that she threw the dish strainer at Officer Hyland.  For the reasons detailed below, I disagree.

As noted above, with respect to Angela's charges, no probable cause was found for the witness intimidation charge, and the charges of disorderly conduct and inciting a riot were dismissed.  Angela admitted to sufficient facts to the charges of assault and battery with a dangerous weapon, interfering with a police officer and resisting arrest.  She was given concurrent one month periods of probation, which she successfully completed without incident, and ordered to write a letter of apology.

The defendants contend that the fact that Angela admitted to sufficient facts to the ABDW charge establishes that she threw the phone.  Again, I reject this argument.  The apology letter that Angela wrote makes no mention of throwing anything.

I also note that neither Henriqueta's nor Angela's plea colloquies were put into evidence.  Their criminal records do not identify the alleged dangerous weapons.  (See Exs. 7, 11).  Even if the colloquies referenced throwing items, I find that Henriqueta and Angela found it expedient to have admitted to whatever facts were proffered, as continu-

42

ing to challenge the charges would require more money, and all charges were in effect

being dismissed.  Thus, despite their admission to sufficient facts, I accept as true

Henriqueta's testimony that she did not hit Officer Hyland with a dish strainer, or

anything else.  I also accept as true Angela's testimony that she did not throw the phone.

Additional facts will be included below where appropriate.

## III.   RULINGS OF LAW

### A.      Standard for Claims Pursuant to 42 U.S.C. § 1983

Henriqueta, Angela and Maria Barbosa have brought claims under 42 U.S.C.

§ 1983 alleging violations of their constitutional rights.  Section 1983 "is not itself a

source of substantive rights, but merely provides a method for vindicating federal rights

elsewhere conferred."  Graham v. Connor, 490 U.S. 386, 393-94, 109 S. Ct. 1865, 1870,

104 L. Ed. 2d 443 (1989) (quotations and citation omitted).  It provides:

> Every person who, under color of any statute, ordinance, regulation,
> custom, or usage, of any State or Territory or the District of
> Columbia, subjects, or causes to be subjected, any citizen of the
> United States or other person within the jurisdiction thereof to the
> deprivation of any rights, privileges, or immunities secured by the
> Constitution and laws, shall be liable to the party injured in an action
> at law, suit in equity, or other proper proceeding for redress ....

42 U.S.C. § 1983.

"A claim under section 1983 has two essential elements.  First, the challenged

conduct must be attributable to a person acting under color of state law" and "second, the

conduct must have worked a denial of rights secured by the Constitution or by federal

law."  Soto v. Flores, 103 F.3d 1056, 1061 (1st Cir. 1997).  The plaintiffs base their

§ 1983 claims on the defendants' conduct in entering and remaining at their premises without probable cause, the defendants' alleged use of excessive force, and the defendants' alleged abusiveness and deliberate indifference to their medical needs while in custody.

The defendants do not dispute that they were acting under color of state law in connection with the events at issue. However, they contend that their conduct did not deprive the plaintiffs of their constitutional rights. For the reasons detailed below, this court disagrees.

I find that Officers Hyland and Donahue violated Henriqueta's and Manuel's Fourth Amendment rights by entering their home without a warrant and by remaining there after the music was turned off. I find further that Officer Hyland violated Henriqueta's Fourth Amendment rights, and Officer Drane violated Angela's Fourth Amendment rights, by using excessive force in connection with their arrests. I also find that Officers Johnson and Baez violated Maria's Fourth Amendment rights by using excessive force in connection with her arrest.[11] I find further that the plaintiffs have not met their burden in connection with their claims of deliberate indifference to their medical needs.

_____

[11] It does not appear that Maria is asserting a Fourth Amendment claim of arrest without probable cause. She has, however, asserted a state law claim of false arrest, which applies the same standard. As detailed below, I find that Maria has met her burden of proof on her false arrest claim  For the same reasons, she would prevail on a Fourth Amendment false arrest claim as well.

**Damages**

"[T]he basic purpose of a § 1983 damages award should be to compensate persons for injuries caused by the deprivation of constitutional rights[.]" Carey v. Piphus, 435 U.S. 247, 254, 98 S. Ct. 1042, 1047, 55 L. Ed. 2d 252 (1978). Such compensatory damages may include, but are not limited to, compensatory damages for the physical injury, pain and suffering, mental anguish, shock, and discomfort the plaintiff has suffered, and is reasonably certain to suffer in the future, because of the defendant's conduct. Martin A. Schwartz & George C. Pratt, Section 1983 Litigation Jury Instructions § 18.01.1 (Aspen Publishers 2013).

The plaintiffs have the burden of proving by a preponderance of the evidence that there is "a sufficient causal connection between the defendant's acts and the alleged injury." Fernandez v. Chardon, 681 F.2d 42, 55 (1st Cir. 1982), aff'd sub. nom. Chardon v. Soto, — U.S. — , 103 S. Ct. 2611, 77 L. Ed. 2d 47 (1983).

A medical expert may be required "where the cause of an injury claimed to have resulted from a negligent act is a complicated medical question involving fact finding which properly falls within the province of medical experts (especially when the symptoms of the injury are purely speculative in nature, or where disability does not develop until some time after the negligent act)[.]" Craig v. Chenoweth, 232 Md. 397, 400, 194 A.2d 78, 79 (1963) (internal quotation and citation omitted). In the instant case, I find that although I accept Maria's testimony regarding her perceived pain and anxiety, in the absence of an expert opinion, I cannot find that her complaints of continued debilitating

pain and suffering were substantially caused by the events of November 2008.  Moreover, I find that even with her continued pain and suffering, Maria has successfully attended college, held responsible employment, and made a life for herself.  I also find that while Henriqueta may be suffering from pains in her neck and elsewhere, she has not met her burden of proving permanent physical injury as a result of the events of November 2008.

Pre-judgment interest on § 1983 damages may be awarded upon a finding that it is necessary to fully compensate the plaintiff.  See Furtado v. Bishop, 604 F.2d 80, 97-98 (1st Cir. 1979).

Punitive damages may be awarded in a § 1983 action where "the award is justified by the defendant's 'bad faith.'  Most courts agree, however, that intentional interference with constitutional rights, standing alone, is not enough; there must also be 'aggravating circumstances.'"  Alicea Rosado v. Garcia Santiago, 562 F.2d 114, 121 (1st Cir. 1977) (internal citation omitted).  Moreover, punitive damages are not warranted if actual damages are "suffic[ient] to deter a defendant's wrongdoing."  Id.

In the instant case, Officer Hyland has testified that even in retrospect, he would not do anything differently.  Moreover, as I have found above, Officer Hyland's testimony that he entered the home without a warrant due to his concern about the children was a recent fabrication.  I find that the question whether punitive damages are warranted in the instant case is a close one.  However, I will not award punitive damages because I find that the award of actual damages is a sufficient deterrent.

**B.      <u>Standard for Qualified Immunity</u>**

46

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 555 U.S. 223, 231, 129 S. Ct. 808, 815, 172 L. Ed. 2d 565 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396 (1982)). It "gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." Stanton v. Sims, No. 12-1217, — S. Ct. — , 2013 WL 5878007, at *2 (Nov. 4, 2013) (internal quotations omitted).

"Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. The protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." Pearson, 555 U.S. at 231, 129 S. Ct. at 815 (quotations and citations omitted).

The determination whether an official is entitled to qualified immunity requires an assessment as to whether the facts alleged or shown by the plaintiff "make out a violation of a constitutional right" and, if so, "whether the right at issue was clearly established at the time of defendant's alleged misconduct." Id. at 232, 129 S. Ct. at 816 (quotations and citations omitted). "[T]he second, 'clearly established' step of the qualified immunity

47

analysis . . . in turn, has two aspects."  <u>Maldonado v. Fontanes</u>, 568 F.3d 263, 269 (1st

Cir. 2009).  As the First Circuit has described:

> One aspect of the analysis focuses on the clarity of the law at the time
> of the alleged civil rights violation.  To overcome qualified immunity,
> the contours of the right must be sufficiently clear that a reasonable
> official would understand that what he is doing violates that right.
> The other aspect focuses more concretely on the facts of the
> particular case and whether a reasonable defendant would have
> understood that his conduct violated the plaintiffs' constitutional
> rights.  Indeed, it is important to emphasize that this inquiry must be
> undertaken in light of the specific context of the case, not as a broad
> general proposition.

<u>Id.</u> (quotations, citations and alterations omitted).  Thus, "the relevant, dispositive inquiry

in determining whether a right is clearly established is whether it would be clear to a

reasonable officer that his conduct was unlawful in the situation he confronted."  <u>Id.</u>

(quotations, citations and alterations omitted).

The defendants contend that they are entitled to qualified immunity in connection

with their decision to enter the home without a warrant under the community caretaking

doctrine.  As detailed below, this court finds that argument unpersuasive.

### C.    <u>The Entry Into The Barbosa Home</u>

### <u>Warrantless Entry</u>

For the reasons detailed herein, this court finds that Officers Hyland and Donahue

violated the Fourth Amendment rights of the homeowners Henriqueta and Manuel

Barbosa.

As the First Circuit has explained:

> We begin with the "basic rule ... that, absent consent or exigency, a warrantless search of the home is presumptively unconstitutional" under the Fourth Amendment. *Groh v. Ramirez,* 540 U.S. 551, 564, 124 S. Ct. 1284, 157 L. Ed. 2d 1068 (2004). "To show exigent circumstances, the police must reasonably believe that 'there is such a compelling necessity for immediate action as will not brook the delay of obtaining a warrant.'" *United States v. Samboy,* 433 F.3d 154, 158 (1st Cir. 2005) (quoting *Fletcher v. Town of Clinton,* 196 F.3d 41, 49 (1st Cir.1999)). "Proof of exigent circumstances should be supported by particularized, case-specific facts, not simply generalized suppositions about the behavior of a particular class of criminal suspects." *Id.* (citation omitted).

DeMayo v. Nugent, 517 F.3d 11, 15 (1st Cir. 2008).

It is undisputed that the police officers did not have consent to enter the Barbosa home.

"There are four recognized categories of exigent circumstance: (1) hot pursuit of a fleeing felon; (2) threatened destruction of evidence inside a residence before a warrant can be obtained; (3) a risk that the suspect may escape from the residence undetected; or (4) a threat, posed by a suspect, to the lives or safety of the public, the police officers, or to herself." Fletcher v. Town of Clinton, 196 F.3d 41, 49 (1st Cir. 1999) (internal quotations omitted). None of these situations existed in the instant case.

I find that Officer Hyland's fear that he might have to return to the home to have the music turned down a second time to prevent the plaintiffs from disturbing the peace does not qualify as exigent circumstances. Thus, even if an unidentified individual stated that they were going to turn the music up after the police left, it would not justify the warrantless entry into the home.

I also find that the fact that there was loud music emanating from the home did not constitute exigent circumstances justifying the warrantless entry into the Barbosa home. Moreover, Officer Hyland himself testified that he did not believe that there were exigent circumstances justifying his warrantless entry into the home.

Courts have long recognized, that "[w]hatever intimidating – and hence compelling circumstances – the police may have to dispense with the warrant requirement to enter a dwelling," the mere fact that there was loud music coming from a home, in and of itself, does not rise to the level of such an exigency.  See Commonwealth v. Kiser, 48 Mass. App. Ct. 647, 651, 724 N.E.2d 348, 352 (2000).  Thus, in rejecting a claim that a complaint about a loud party constituted exigent circumstances which justified the warrantless entry into a home, the Massachusetts Supreme Judicial Court in Kiser held:

> As the Supreme Court put it, 'it is difficult to conceive of a warrant-less home arrest that would not be unreasonable under the Fourth Amendment when the underlying offense is extremely minor.' *Welsh v. Wisconsin,* 466 U.S. 740, 753, 104 S. Ct. 2091, 80 L. Ed. 2d 732 (1984).  Playing music—even so loudly that it disturbs the neighbors—is an extremely minor offense.

Kiser, 48 Mass. App. Ct. at  651, 724 N.E.2d at 352.

Given this clear statement of the law from a Massachusetts court, I find that Officers Hyland and Donahue knew or reasonably should have known that it was unlawful for them to enter the Barbosa home without a warrant just because there was loud music.[12]

---

[12]  It is unclear whether the defendants are claiming that they are entitled to qualified immunity on the issue whether they were allowed to enter the home because of the loud music, or just on their decision to stay.  If they are seeking qualified immunity on their decision to enter, I

The defendants cite to United States v. Rohrig, 98 F.3d 1506 (6th Cir. 1996), where the court found that "the governmental interest in immediately abating an ongoing nuisance by quelling loud and disruptive noise in a residential neighborhood [may be] sufficiently compelling to justify warrantless intrusions" where "strict adherence to the warrant requirement would subject the community to a continuing and noxious disturbance for an extended period of time without serving any apparent purpose." Id. at 1522. However, even assuming Rohrig would be followed in this jurisdiction, and there is no indication that it would, Rohrig is distinguishable from the instant case in many significant respects. Perhaps most importantly, in determining that the police officers' conduct in entering the home without a warrant was reasonable, the Rohrig court found it critical that the officers had "attempted to abate the nuisance through various measures short of entering Defendant's home, including repeated banging on Defendant's front door and tapping on his windows." Id. at 1524. As I have found in the instant case, however, Officers Hyland and Donahue did not knock or make their presence known before entering the home.

In addition, Rohrig has been limited to the situation where there is evidence of a "continuing and noxious disturbance." See, e.g., State v. Price, 134 Ohio App. 3d 464, 468-69, 731 N.E.2d 280, 283-84 (1999) (distinguishing Rohrig and finding that loud music, alone, was insufficient to justify warrantless entry); United States v. Meixner, 128

find that the law on this issue is clearly established in Massachusetts and they are not entitled to qualified immunity.

F. Supp. 2d 1070, 1075 (E.D. Mich. 2001) (Rohrig was predicated on finding that "the noise was continuous and offensive to neighbors" and "it was necessary to immediately abate the nuisance").  Here, the police waited for about an hour before even sending a police car to the site.  This delay negates any conclusion that it was necessary to immediately enter the home.  There were no exigent circumstances.

**Community Caretaking Doctrine**

Officer Hyland contends that he entered the home without a warrant because of his concern about the children.  As detailed above, I reject this contention.  Thus, as a factual matter, there is no support for the application of the community caretaking doctrine.  Moreover, even a most sympathetic view of the evidence in favor of the officers mandates the conclusion that they are invoking the community caretaking doctrine as a subterfuge for investigation.

In Cady v. Dombrowski, the Supreme Court recognized that police officers frequently "engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute."  Cady v. Dombrowski, 413 U.S. 433, 441, 93 S. Ct. 2523, 2528, 37 L. Ed. 2d 706 (1973).  This doctrine recognizes that "[t]he policeman plays a rather special role in our society; in addition to being an enforcer of the criminal law, he is a 'jack-of-all-emergencies,' W. LaFave, *Search and Seizure* § 5.4(c) (2d ed. 1987), expected to aid those in distress, combat actual hazards, prevent potential hazards from materializing, and provide an infinite variety of services to preserve

52

and protect community safety." <u>United States v. Rodriguez-Morales</u>, 929 F.2d 780, 784-85 (1st Cir. 1991).

"Virtually by definition, the need for police to function as community caretakers arises fortuitously, when unexpected circumstances present some transient hazard which must be dealt with on the spot." <u>Id.</u> at 787.

"When an officer is performing a community caretaking role, the imperatives of the Fourth Amendment are satisfied so long as his actions are reasonable." <u>Macdonald v. Town of Eastham</u>, No. 12-12061-RGS, — F. Supp. 2d — , 2013 WL 2303760, *3 (D. Mass. May 24, 2013) (citing <u>United States v. Coccia</u>, 446 F.3d 233, 239 (1st Cir. 2006)).

As long as the actions allegedly taken "pursuant to the community caretaking function [are] not a mere subterfuge for investigation, the coexistence of investigatory and caretaking motives will not invalidate the seizure." <u>Rodriguez-Morales</u>, 929 F.2d at 787.

In the instant case, I find that Officer Hyland's trial testimony that he entered and/or stayed in the home due to his concern for the children therein was unsubstantiated by either his actions or his prior testimony.

Moreover, any actions he may have taken in the home based on caretaking motives were, in fact, "a subterfuge for further criminal investigation." <u>State v. D'Amour</u>, 150 N.H. 122, 124-26, 128, 834 A.2d 214, 216-17, 219 (N.H. 2003) (reversing summary judgment entered in favor of the police because "the trial court's finding that the initial search and seizure of the backpack was done solely as community caretaking was clearly erroneous"). Once the music was shut off, Officers Hyland and Donahue were most

53

concerned with obtaining identification from the homeowner, i.e., furthering their investigation.  They took no steps to safeguard the children.

The defendants rely on Macdonald v. Town of Eastham, where the defendant police officers were granted qualified immunity after entering the plaintiff's home without a warrant in response to a call from a neighbor reporting that the door to the home had been left wide open and the neighbor was concerned.  In Macdonald, the police announced their presence prior to entering the home, and only went in after receiving no response. Macdonald, 2013 WL 2303760, at *1.  The state court suppressed drugs found by the police upon their entry, finding the warrantless entry to have been unconstitutional.  Id. at *2.  Macdonald then brought an action against the officers under § 1983.  The District Court (Stearns, J.) found that the police officers were performing a community caretaking role when they searched the home for the limited purpose of determining if anyone was lurking inside.  Id. at *3.  He further found, however, that "[t]here is a split of authority, state and federal, as to whether the community caretaking doctrine extends beyond the context of automobile searches" to a warrantless entry into a home.  Id. at *4.  Since the law was unsettled on this point, Judge Stearns ruled that the police were entitled to qualified immunity.  He concluded that "[f]aced with this absence of controlling authority and conflicting precedent, a reasonable officer would not have known whether his actions violated Macdonald's Fourth Amendment rights."  Id. at *5.

Macdonald does not aid the defendants in the instant case.  Here, the law was clear that the police officers' warrantless entry into a home to quell loud music, especially

without taking steps to make their presence known, violated the Fourth Amendment.  The issue is not whether the defendants knew that the community caretaking doctrine allowed them to enter a home.  Rather, the issue is whether the doctrine has any application to the facts of the instant case.  It does not, and the defendants are not entitled to qualified immunity in connection with their entry into the Barbosas' home.

### D.     The Claimed Use Of Excessive Force

Henriqueta, Angel and Maria have all brought claims of excessive force.  I find that the police did use excessive force in connection with each of their arrests.

Where "an excessive force claim arises in the context of an arrest, the claim 'must be analyzed in light of the Fourth Amendment's prohibition of unreasonable searches and seizures.'"  LaFrenier v. Kinirey, 478 F. Supp. 2d 126, 137-38 (D. Mass. 2007) (quoting Gaudreault v. Municipality of Salem, 923 F.2d 203, 205 (1st Cir. 1990)).  "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."  Graham v. Connor, 490 U.S. 386, 396, 109 S. Ct. 1865, 1871, 104 L. Ed. 2d 443 (1989) (quotations and citations omitted).  Thus, the critical question is "whether 'the defendant officer employed force that was unreasonable under the circumstances.'"  Raiche v. Pietroski, 623 F.3d 30, 36 (1st Cir. 2010) (quoting Jennings v. Jones, 499 F.3d 2, 11 (1st Cir. 2007)).

In applying the test for reasonableness under the Fourth Amendment, courts must pay "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396, 109 S. Ct. at 1872. However, in doing so, it is important to remain mindful that "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. As the Supreme Court has cautioned,

> [n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation.

Id. at 396-97, 109 S. Ct. at 1872 (internal quotations and citation omitted).

## Henriqueta

This court recognizes that because Henriqueta and Angela admitted to sufficient facts, they cannot base their § 1983 action on a claim for false arrest.[13] Nevertheless, the circumstances presented here are that the police themselves caused the altercation by first

---

[13] It is well established that "[a] § 1983 claim is not cognizable if its success would necessarily imply the invalidity of an underlying conviction or sentence." Salcedo v. Town of Dudley, 629 F. Supp. 2d 86, 102 (D. Mass. 2009) (citing Heck v. Humphrey, 512 U.S. 477, 486-87, 114 S. Ct. 2364, 2372-73 (1994)) (court assumes, without deciding, that an admission to sufficient facts and a continuance without a finding "constitutes a conviction for the purposes of the *Heck* limitation on subsequent § 1983 actions").

unlawfully entering the home without probable cause, and then unlawfully disbanding the

family party.  Simply put, "[a]fter the police asked the occupants of the apartment to turn

down the music, there was no reason to arrest them."  Commonwealth v. Kiser, 48 Mass.

App. Ct. at 653, 724 N.E.2d at 353.  "A police officer is not a law unto himself; he cannot

give an order that has no colorable legal basis and then arrest a person who defies it."

Iacobucci v. Boulter, 193 F.3d 14, 25 (1st Cir. 1999).  Under such circumstances, even if

you assume that the police were entitled to arrest Henriqueta, only the most minimal force

would be allowable.

I find that the police did not arrest Henriqueta or Angela for anything to do with the

music, which had been turned off before the disturbance which resulted in their arrest.

Rather, I find that the police arrested them for their strong objections to the arrest of

Andrade and the continued police presence in the home.  Moreover, even under the

defendants' scenario, Henriqueta and Angela were not engaged in serious criminal

behavior.  Their conduct came down to verbally challenging the police decision to break

up the party and arrest Andrade.  I find that neither of them posed such an immediate

threat to the safety of the officers that significant force was warranted.

The conduct for which Henriqueta and Angela were arrested did not even rise to

the level of disorderly conduct, since the melee occurred in the privacy of the Barbosas'

home.  Where the conduct charged takes place on "purely private property[,]" the police

must also "establish that the disturbance nevertheless had or was likely to have had an

impact upon persons in an area accessible to the public."  Commonwealth v. Mulvey, 57

Mass. App. Ct. 579, 583, 784 N.E.2d 1138, 1142 (2003).  They failed to do so in the instant case.  For the same reason, apart from the loud music, which was promptly shut off, the conduct inside the home did not rise to the level of disturbing the peace.  Udemba v. Nicoli, 237 F.3d 8, 13-14 (1st Cir. 2001) ("An officer has probable cause to arrest a person for disturbing the peace if that person, in the officer's presence, engages in unreasonably disruptive conduct that annoys or disturbs one or more other individuals.").  Furthermore, it has long been established that drunkenness in one's own home is not a breach of the peace.  Commonwealth v. Gorman, 288 Mass. 294, 298, 192 N.E. 618, 620 (1934).

Even more significantly, yelling at police, especially in the privacy of one's own home, does not constitute a crime.  See Veiga v. McGee, 26 F.3d 1206, 1214 (1st Cir. 1994) (speech alone does not constitute disorderly conduct); Nuon v. City of Lowell, 768 F. Supp. 2d 323, 331-33 (D. Mass. 2011) (summary judgment in favor of plaintiff on claim of false arrest where plaintiff's conduct in standing in front yard yelling at policeman, waiving his arms, and refusing to obey order to be quiet and go inside, did not constitute disorderly conduct).  Rather, it is well established that "the First Amendment protects a significant amount of verbal criticism and challenge directed at police officers[.]"  Houston v. Hill, 482 U.S. 451, 461, 107 S. Ct. 2502, 2509, 96 L. Ed. 2d 398 (1987).  "Surely, one is not to be punished for nonprovocatively voicing [her] objection to what [she] obviously felt was a highly questionable detention by a police officer."  Norwell v. Cincinnati, 414 U.S. 14, 16, 94 S. Ct. 187, 188, 38 L. Ed. 2d 170 (1973) (per

curiam) (arrest of individual for walking away from police officer and protesting his arrest was an unconstitutional punishment of constitutionally protected speech).  See also Payne v. Pauley, 337 F.3d 767, 777 (7th Cir. 2003) ("Police officers must be more thick skinned than the ordinary citizen and must exercise restraint in dealing with the public. . . . It would be inherently unfair if an officer could rile up a crowd by mistreating a citizen in front of the crowd, and then could arrest that citizen for creating the disturbance.").

As detailed above, I find that Henriqueta did not bring the silverware strainer down on Officer Hyland's head or otherwise throw the silverware at him.

Even assuming, arguendo, that Officers Hyland and Drane believed that Henriqueta had struck Officer Hyland, at most it could only have been considered an impulsive act. Officer Hyland had just engaged in a civil conversation with Henriqueta, she had agreeably provided her identification to him, the music was off, and she was washing the dishes.  Henriqueta is a slight woman who had not exhibited erratic or violent behavior until the police escalated matters.

I find that by slamming Henriqueta against the wall, cuffing her hands behind her back, dragging her outside, letting her fall to the ground, unable to rise, after which she was dragged by someone, Officer Hyland used excessive force in connection with the arrest of Henriqueta.

I find that Henriqueta suffered bruises and pain.  I do not find, however, that she has established any permanent physical injury.  I also find that Henriqueta suffered emotional pain and distress which continues to today.

59

## **Angela**

For the same reasons, I find that the use of force in arresting Angela was also unreasonable. Again, I find that Angela was not arrested due to the loud music. Rather, she was arrested after objecting strenuously to the arrest of her boyfriend and her mother. Her verbal objections, however, did not warrant her arrest.

Again, even if Officers Hyland and Drane believed that Angela had thrown the phone at Officer Hyland's leg (and I find that she did not do so), this would still not have warranted the level of force used in arresting her.

Like her mother, Angela was fully cooperative with the police, assisting them in obtaining identification from her mother and the like, until they decided to break up the party and arrest Andrade. Thus, even if the police believed that Angela had thrown the phone, it should have objectively been viewed as an impulsive act.

Officer Drane has admitted that he heard someone say that Angela was either pregnant or had had a C-section. Under such circumstances, the use of force was even more inappropriate.

I find that Angela suffered bruises, which have healed, and pain which has abated. I also find that she suffered emotional pain and distress which continues to today.

## **Maria**

In evaluating Maria's claim of use of excessive force, I rely not only on my assessment of the credibility of the witnesses, but also on an adverse inference which I draw as a result of the destruction of the tape of the events that transpired involving Maria.

60

Although the defendants asserted that the tape was relevant to the so-called investigation of Maria's complaint, no steps were taken to preserve the tape.  "When [evidence] relevant to an issue in a case is destroyed, the trier of fact sometimes may infer that the party who obliterated it did so out of a realization that the contents were unfavorable."  Blinzler v. Marriott Int'l, 81 F.3d 1148, 1158 (1st Cir. 1996).  That is the situation here.

"Before such an inference may be drawn there must be a sufficient foundational showing that the party who destroyed the [evidence] had notice both of the potential claim and of the document's potential relevance."  Id. at 1159.  Such a foundation is easily established in the instant case given the acknowledgment by the police of their receipt of Maria's complaint.  Moreover, although the exact standard for imposing the adverse inference remains undefined, the imposition must "make sense in the context of the evidence[.]"  United States v. Laurent, 607 F.3d 895, 903 (1st Cir. 2010) (no adverse-inference instruction warranted where police video surveillance tape routinely erased after lengthy period without an arrest).  In the instant case, an inference that the tape revealed information adverse to the police makes sense in the context of the dispute.[14]

As detailed above, the tape was allegedly viewed by experienced law enforcement officers.  It is unclear how the tape could then be taped over, and its destruction violated fundamental principles of an investigation.  In light of the numerous unsupportable charges brought against the members of the Barbosa family, I decline to find that the tape

---

[14]  The fact that an adverse inference should be drawn is supported by (although in no way dependent on) the fact that all charges were dismissed against Maria.

was "destroyed accidently or for an innocent reason[.]"  Blinzler, 81 F.3d at 1159.  I also

find that the destruction of the tape caused Maria significant harm by forcing her to defend

herself without access to critical evidence.  I find that an adverse inference that the tape

contained information favorable to Maria and adverse to the Brockton police is

appropriate.  See Kelley v. United Airlines, Inc., 176 F.R.D. 422, 427-28 (D. Mass. 1997)

(jury could draw adverse inference from routine destruction of documents after notice of a

claim).

Viewing the circumstances of her arrest, I find that Officers Johnson and Baez used

excessive force in connection with Maria's arrest.

At most, Maria yelled at Officer Johnson.  There is no evidence that she instigated

a physical altercation with the police.  She was on her way out, albeit unhappily, when she

was carried back into the lobby by the officers — she was not walking on her own.  Maria

was thrown down on the bench with sufficient force to cause bruising around her eye.  She

was then carried and/or dragged down to the garage.  Her conduct did not warrant such

rough treatment.

While Captains Gomes and McCabe witnessed Maria's arrest, I do not find them

liable for her injuries.  Given that the entire incident only took a few minutes, realistically

these officers did not have an opportunity to intervene.  See Torres-Rivera v. O'Neill-

Cancel, 406 F.3d 43, 52 (1st Cir. 2005).

I find that Maria suffered physical injuries to her head and eye area, and that she

has suffered from migraine headaches.  However, the doctors have been unable to identify

the cause of these problems.  Absent any expert testimony, I am unable to ascertain the

cause or extent of any alleged permanent physical injury.

I also find that Maria suffered emotional pain and suffering as a result of the

altercation, and that she continues to suffer from some level of anxiety up until today.  I

do not find, however, that Maria has met her burden of proving that the serious

psychological harm she claims to have suffered is causally related to the November 16,

2008 incident.  Expert testimony would, in this court's view, be needed to establish such

causation.  In addition, the records put into evidence indicate that Maria declined

psychological counseling.  Moreover, the evidence before this court is that, regardless of

her diagnoses, Maria has made much progress in her life.  She has attended college and

has worked.  Therefore, I find that Maria has been able to function fully regardless of any

permanent or physical and emotional trauma she has suffered.

### E.     Deliberate Indifference to Medical Needs

Henriqueta, Angela and Maria testified that they asked for medical help but they

were ignored.  I find, however, that they have failed to establish deliberate indifference to

their medical needs.

The due process clause of the Fourteenth Amendment requires "responsible

governmental authorities to provide medical care to persons who have been injured while

being apprehended by the police."  Gaudreault v. Municipality of Salem, Mass., 923 F.2d

203, 208 (1st Cir. 1990).  "Generally, the standard applied [to such claims] is the same as

the Eighth Amendment standard."  Ruiz-Rosa v. Rullan, 485 F.3d 150, 155 (1st Cir.

2007). "The Eighth Amendment, in turn, imposes a duty to attend to a prisoner's 'serious medical needs.'" Gaudreault, 923 F.2d at 208 (quoting Cortes-Quinones v. Jimenez-Nettleship, 842 F.2d 556, 558 (1st Cir. 1988)). "A medical need is 'serious' if it is one that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Id. "Government officials violate the Constitution if they exhibit 'deliberate indifference' to such needs." Id. (quoting Estelle v. Gamble, 429 U.S. 97, 106, 97 S. Ct. 285, 292, 50 L. Ed. 2d 251 (1976)).

"In order to establish deliberate indifference, the [plaintiff] must prove that the defendant[ ] had a culpable state of mind and intended wantonly to inflict pain." DesRosiers v. Moran, 949 F.2d 15, 19 (1st Cir. 1991). The negligent failure to provide medical care does "not sink to the level of deliberate indifference." Id. (citations omitted).

I find that although Henriqueta and Angela were bruised, they did not have serious medical conditions which the defendants ignored. Neither has submitted any medical records. According to their testimony, they did not receive any significant medical treatment at the hospital. Thus, they have not met their burden of proving that the defendants ignored a serious medical need.

Moreover, the plaintiffs have not established that the defendants acted with the requisite intent. "The requisite state of mind may be manifested by the official['s] response to [the plaintiff's] known needs or by denial, delay, or interference with

64

prescribed health care." Id.  In the instant case, however, there is no evidence that the

defendants interfered with the plaintiffs' ability to obtain medical treatment.

Maria did suffer bruises during her arrest.  However, she has not met her burden of

proving that the police were deliberately indifferent to her medical needs.  As an initial

matter, while bruised, it does not appear that she suffered from any serious medical

condition.  Moreover, the police did not prevent her from receiving medical treatment

promptly upon her release.  Therefore, the plaintiffs' claims of deliberate indifference to

the plaintiffs' medical needs will be dismissed.

### F.      State Law Claims

#### 1.      Intentional Infliction of Emotional Distress

Henriqueta, Angela, Maria and Manuel have brought claims against the arresting

defendants for intentional infliction of emotional distress.  I find that the plaintiffs have

failed to meet their burden of proof as to these claims.

> To sustain a claim of intentional infliction of emotional distress, a
> plaintiff must show (1) that the defendant intended to cause, or
> should have known that his conduct would cause, emotional distress;
> (2) that the defendant's conduct was extreme and outrageous; (3) that
> the defendant's conduct caused the plaintiff's distress; and (4) that the
> plaintiff suffered severe distress. *Agis v. Howard Johnson Co.,* 371
> Mass. 140, 144-145, 355 N.E.2d 315 (1976), and cases cited.  To be
> considered extreme and outrageous, the defendant's conduct must be
> "beyond all bounds of decency and ... utterly intolerable in a civilized
> community." *Id.* at 145, 355 N.E.2d 315, quoting Restatement
> (Second) of Torts § 46 comment d (1965).  Liability cannot be
> founded upon mere insults, threats, or annoyances. *Foley v. Polaroid
> Corp.,* 400 Mass. 82, 99, 508 N.E.2d 72 (1987).

Sena v. Com., 417 Mass. 250, 263-64, 629 N.E.2d 986, 994 (1994).  Moreover, to the extent that police are merely carrying out their obligations as law enforcement officers, their conduct as a matter of law is not deemed extreme and outrageous.  See Sietins v. Joseph, 238 F. Supp. 2d 366, 379 (D. Mass. 2003).

In the instant case, the plaintiffs have not established that the arresting officers intended to cause or should have known that they were causing emotional distress. Moreover, while overzealous, I do not find that the defendants' conduct was extreme and outrageous and beyond all bounds of decency.  Compare Poy v. Boutselis, 352 F.3d 479, 485-86 (1st Cir. 2003) (officer's extreme use of force, including publicly striking plaintiff repeatedly on face and back, and using handcuffs as brass knuckles with a resulting scar on plaintiff's forehead, supported jury verdict of intentional infliction of emotional distress).

Therefore, plaintiffs' claim of intentional infliction of emotional distress will be dismissed.

### 2.   False Arrest

"False arrest is a species of the tort of false imprisonment."  Nuon v. City of Lowell, 768 F. Supp. 2d 323, 336 (D. Mass. 2011).  Under Massachusetts law, the tort of "[f]alse imprisonment consists of '(1) intentional and (2) unjustified (3) confinement of a person, (4) directly or indirectly (5) of which the person confined is conscious or is harmed by such confinement.'"  Sietins, 238 F. Supp. 2d at 381 (quoting Ball v. Wal-Mart, 102 F. Supp. 2d 44, 55 (D. Mass. 2000)).  "Police officers may be liable for this tort

'unless the police officer had a legal justification' for the restraint." <u>Sietins</u>, 238 F. Supp.

2d at 381 (quoting <u>Rose v. Town of Concord</u>, 971 F. Supp. 47, 51 (D. Mass. 1997)).  Such

justification exists where "the officer had probable cause to arrest the suspect." <u>Sietins</u>,

238 F. Supp. 2d at 381.  "The probable cause standard is a 'relatively low threshold' for

police officers to establish." <u>Id.</u> at 375 (quoting <u>White v. Town of Marblehead</u>, 989 F.

Supp. 345, 349 (D. Mass. 1997)).  It is met "'when police officers, relying on reasonably

trustworthy facts and circumstances, have information upon which a reasonably prudent

person would believe the suspect had committed or was committing a crime.'" <u>United

States v. Jones</u>, 432 F.3d 34, 41 (1st Cir. 2005) (quoting <u>United States v. Young</u>, 105 F.3d

1, 6 (1st Cir. 1997)).

In the instant case, Maria has established that she was arrested at the police station

without probable cause.[15]  As detailed above, Maria was arrested because she yelled at the

police.  She was on her way out of the door, and would have continued exiting if allowed

to do so.  Drawing the adverse inference from the absence of the tape, Maria has

established that the police lacked probable cause to arrest her.  Therefore, she will prevail

on her claim for false arrest.

---

[15]  Since Henriqueta and Angela have admitted to sufficient facts to establish that they committed crimes in connection with the incident at their home, they cannot now claim that the police did not have probable cause to arrest them.  Consequently, this court previously dismissed their claim of false arrest.

67

### 3. <u>Assault and Battery</u>

"Assault and battery is the 'intentional and unjustified use of force upon the person of another, however slight, or the intentional doing of a wanton or grossly negligent act causing personal injury to another.'" <u>Sietins</u>,, 238 F. Supp. 2d at 380 (quoting <u>Jesionowski v. Beck</u>, 937 F. Supp. 95, 105 (D. Mass. 1996)).  Under Massachusetts law, "'an officer authorized to make an arrest may use such force as is reasonably necessary to effect the arrest.'" <u>Id.</u> (quoting <u>Julian v. Randazzo</u>, 380 Mass. 391, 396, 403 N.E.2d 931, 934 (1980)) (punctuation omitted).  Where, as here "a plaintiff alleges both a § 1983 excessive force claim and common law claims for assault and battery, [the] determination of reason-ableness of the force used under § 1983 controls [the] determination of the reasonableness of the force used under the common law assault and battery claims." <u>Raiche</u>, 623 F.3d at 40.  Because, as detailed above, Henriqueta, Angela and Maria have prevailed on their claim for use of excessive force under § 1983, they will also prevail on their assault and battery claim.

### <u>CONCLUSION</u>

For all the reasons detailed herein, I find as follows:

1.      Thomas Hyland and Brian Donahue violated Henriqueta Barbosa's Fourth Amendment rights by entering her home without a warrant, consent or exigent circum-stances, and by remaining in the home after the music was turned off.

    a.      As a result of such conduct, Thomas Hyland and Brian Donahue are jointly and severally liable to Henriqueta Barbosa pursuant to 42 U.S.C. § 1983

(Count I) and for breach of Henriqueta Barbosa's Fourth Amendment rights (Count VII).

      b.     As a result of such conduct, Thomas Hyland and Brian Donahue are jointly and severally liable to Henriqueta Barbosa in the amount of Twenty-five Thousand ($25,000.00) Dollars for compensatory damages.

      c.     I find that pre-judgment interest should be awarded to Henriqueta Barbosa to fully compensate her for her loss.

2.     Thomas Hyland and Brian Donahue violated Manuel Barbosa's Fourth Amendment rights by entering his home without a warrant, consent or exigent circumstances, and by remaining in the home after the music was turned off.

      a.     As a result of such conduct, Thomas Hyland and Brian Donahue are jointly and severally liable to Manuel Barbosa pursuant to 42 U.S.C. § 1983 (Count I) and for breach of Manuel Barbosa's Fourth Amendment rights (Count VII).

      b.     As a result of such conduct, Thomas Hyland and Brian Donahue are jointly and severally liable to Manuel Barbosa in the amount of Seven Thousand Five Hundred ($7,500.00) Dollars for compensatory damages, since Manuel was not witness to much of the unconstitutional behavior.

      c.     I find that pre-judgment interest should be awarded to Manuel Barbosa to fully compensate him for his loss.

3.     I find that Thomas Hyland violated Henriqueta Barbosa's Fourth Amendment rights by using excessive force in connection with her arrest.

a.      As a result of such conduct, Thomas Hyand is liable to Henriqueta

Barbosa pursuant to 42 U.S.C. § 1983 (Count V).

b.      As a result of such conduct, Thomas Hyand is liable to Henriqueta

Barbosa in the amount of Five Thousand ($5,000.00) Dollars in compensatory

damages.[16]

c.      I find that pre-judgment interest should be awarded to Henriqueta

Barbosa to fully compensate her for her loss.

4.      Based on the same conduct, I find that Thomas Hyland is liable to

Henriqueta Barbosa for assault and battery (Counts X, XII).

a.      The damages awarded to Henriqueta Barbosa's pursuant to ¶ 3b

above ($5,000.00) are sufficient to compensate her for the assault and battery; no

additional compensatory damages will be awarded.

b.      However, interest on these damages ($5,000.00) shall be

calculated at the rate of 12% per annum from the date suit was commenced

pursuant to Mass. Gen. Laws ch. 231, § 6B.

5.      I find that Jesse Drane violated Angela Barbosa's Fourth Amendment rights

by using excessive force in connection with her arrest.

a.      As a result of such conduct, Jesse Drane is liable to Angela Barbosa

pursuant to 42 U.S.C. § 1983 (Count V).

---

[16]  The compensatory damages awarded to Henriqueta Barbosa for the unconstitutional
entry into her home and for the use of excessive force are not duplicative.

    b.      As a result of such conduct, Jesse Drane is liable to Angela Barbosa in the amount of Seven Thousand Five Hundred ($7,500.00) Dollars in compensatory damages.

    c.      I find that pre-judgment interest should be awarded to Angela Barbosa to fully compensate her for her loss.

6.      Based on the same conduct, I find that Jesse Drane is liable to Angela Barbosa for assault and battery (Counts X, XII).

    a.      The damages awarded to Angela Barbosa's pursuant to ¶ 6b above ($7,500.00) are sufficient to compensate her for the assault and battery; no additional compensatory damages will be awarded.

    b.      However, interest on these damages ($7,500.00) shall be calculated at the rate of 12% per annum from the date suit was commenced pursuant to Mass. Gen. Laws ch. 231, § 6B.

7.      I find that Steven E. Johnson and Frank Baez violated Maria Barbosa's Fourth Amendment rights by using excessive force in connection with such arrest.

    a.      As a result of such conduct, Steven E. Johnson and Frank Baez are jointly and severally liable to Maria Barbosa pursuant to 42 U.S.C. § 1983 (Counts III, V).

    b.      As a result of such conduct, Steven E. Johnson and Frank Baez are jointly and severally liable to Maria Barbosa in the amount of Fifteen Thousand ($15,000.00) Dollars.

c.      I find that pre-judgment interest should be awarded to Maria Barbosa to fully compensate her for her loss.

8.      I also find that Steven E. Johnson and Frank Baez are jointly and severally liable to Maria Barbosa for false arrest (Count IX), assault (Count XI) and battery (Count XIV).

a.      The damages awarded to Maria Barbosa pursuant to ¶ 8b above ($15,000.00) are sufficient to compensate her for the claims of false and arrest and assault and battery; no additional compensatory damages will be awarded.

b.      However, interest on these damages ($15.000.00) shall be calculated at the rate of 12% per annum from the date suit was commenced pursuant to Mass. Gen. Laws ch. 231, § 6B.

9.      Judgment shall enter in favor of defendants Emanuel Gomes and Leon McCabe on all claims brought against them.

10.      Count XVII: Intentional Infliction of Emotional Distress, and the claims based on alleged deliberate indifference to the plaintiffs' medical needs, are dismissed.

## **ORDER**

Plaintiffs' counsel shall file a proposed Final Judgment in accordance with the court's Findings of Fact and Rulings of Law within fourteen (14) days of the date of this Order.  Defendants' counsel shall file any objection to the proposed Judgment within seven (7) days thereafter.

/ s / Judith Gail Dein

Judith Gail Dein
U.S. Magistrate Judge